2020 IL App (2d) 170827-U
No. 2-17-0827
Order filed April 3, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| ALICIA L. STEPHENSON | ) | of McHenry County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 09-DV-851 |
| | ) | |
| RICHARD STEPHENSON, | ) | Honorable |
| | ) | James S. Cowlin, |
| Respondent-Appellee. | ) | Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court.
Justices Schostok and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*: In this marriage dissolution action, the trial court did not err (1) in declining to consider petitioner's claims for breach of contract and breach of fiduciary duty; (2) in its discovery rulings before and during trial; (3) in awarding petitioner $55,000 per month in maintenance; and (4) in ordering respondent to contribute $2 million toward petitioner's $3.3 million in attorney fees and costs.

¶ 2    In this marriage dissolution action, petitioner, Alicia Stephenson, sought monthly maintenance from respondent, Richard Stephenson, of $433,000 per month, after taxes. Respondent actually stipulated during trial that he was able to pay maintenance in the requested amount. Nonetheless, the court awarded petitioner $55,000 per month, a fraction of what she

wanted. This case tests the principle that a particular amount of maintenance is not appropriate simply because the payor spouse can afford to pay it. See *In re Marriage of Bratcher*, 383 Ill. App. 3d 388, 392 (2008).

¶ 3 On appeal from the dissolution judgment, petitioner challenges the maintenance award as inadequate to provide her a lifestyle comparable to what she enjoyed during the marriage. She also contends that the trial court erred in its discovery rulings before and during trial and also erred in declining to consider her claims for breach of fiduciary duty and breach of contract. Finally, she argues that the trial court awarded her insufficient attorney fees and costs at the conclusion of the trial. For the following reasons, we affirm.

¶ 4 I. BACKGROUND

¶ 5 The following background will be supplemented as we discuss each issue on appeal.

¶ 6 A. The Prenuptial Agreement

¶ 7 Respondent founded Cancer Treatment Centers of America, Inc. (CTCA) in 1988. CTCA is a network of hospitals specializing in cancer treatment. CTCA is itself part of a vast group of business entities and trusts referenced in the proceedings as the "Stephenson Family Entities."

¶ 8 The parties met in 1985 and began dating several months later. On September 6, 1991, the parties signed a "Prenuptial Agreement" (PNA). The preamble to the PNA provided that respondent had "substantial" income and assets while petitioner's income and assets were "modest." Petitioner had an associate degree in fashion merchandising and was "capable and desirous of obtaining further education." The parties "contemplate[d] that [petitioner] will not be gainfully employed during the marriage." However, respondent wished "to encourage, facilitate and pay for [petitioner's] obtainment of an undergraduate college degree and any other

educational/professional opportunities which she may wish to pursue during the marriage." The preamble further stated:

> "It is the desire of [the parties] to define their pecuniary expectations and responsibilities during their contemplated marriage and to limit, fix and determine the rights and claims that will vest in and accrue to each of them in the estate and property of the other by virtue of their marriage and to accept the provisions of this Agreement in lieu of and in full settlement and satisfaction and discharge of all such rights and claims, including the right of either party to spousal maintenance, alimony and support in the event either party initiates an action for legal separation or divorce."

¶ 9    The parties noted that petitioner was given both an inventory of respondent's current assets and an estimate of his current income, and that she was entering into the PNA with full knowledge of his assets and income.

¶ 10    The inventory that petitioner reviewed was respondent's personal financial statement dated July 1, 1991. In that statement, respondent reported a net worth of $18 million and annual income of $4 million.

¶ 11    Article 2 of the PNA deemed, as the nonmarital property of each party, (1) all property held by the party prior to the marriage, including "all interest, dividends, rents, income, gains and profits which may in time be generated by or realized from such property"; and (2) any property acquired by the party during the marriage "by reason of his or her own separate funds, income or assets." The PNA further provided that each party

> "shall have the right to control, manage, encumber, pledge and dispose of his or her own separate nonmarital property at his or her own díscretion, free from the interference or control of the other, for his or her own pleasure, convenience and purpose, to the same

extent as if the parties had not been joined in marriage; and [either party] shall, upon request by the other, execute any and all documents and instruments which may from time to time be necessary to effectuate the provisions of this Agreement."

¶ 12    Article 2 also stated that the parties "may during their marriage, for convenience or other purposes, cause title to any of their respective separate nonmarital property to be transferred and held by them in joint tenancy, tenancy by the entirety or some other form of co-tenancy with the other without such act being construed as a waiver, release or intent to breach or disclaim the provisions of this Agreement."  In the event of an action for legal separation or dissolution,

"such non-marital property which either party transferred in co-tenancy with the other (or any equivalent form of ownership under the laws of any jurisdiction) shall be and remain the separate non-martial property of the particular party who caused title to be transferred in joint tenancy or some other form of co-tenancy, it being the express intention of the parties that the act of transferring any of their respective separate non-marital property to some form of co-ownership with the other during their marriage shall not be construed as a gift or transmutation of the nature of such property from 'nonmarital' to 'marital.' "

¶ 13    Article 3 of the PNA stated that the parties intended their primary marital residence to be their Barrington Hills estate known as "Tudor Oaks."  If either party filed for separation or dissolution, petitioner would have not more than 120 days from the date of filing to vacate Tudor Oaks. If the parties had been married more than seven years as of the filing, or certain other conditions were met, then respondent would provide petitioner with all funds necessary to purchase a residence with a price not to exceed $250,000, adjusting for inflation or deflation from

1991 according to the Consumer Price Index. (A home selling for $250,000 in 1991 would sell for approximately $450,000 in 2017, the year that the trial court issued its dissolution judgment.[1])

¶ 14 Article 4 of the PNA addressed maintenance, and provided:

"It is the desire of [the parties] to fix, limit and define their respective obligations to provide for the other's spousal maintenance, alimony and support in the event either party commences an action for legal separation or dissolution of their contemplated marriage."

Respondent expressly waived his right to maintenance. As for petitioner's maintenance, the PNA provided that, in the event of a proceeding for separation or dissolution, petitioner

"shall have the primary responsibility for her individual maintenance and support. Accordingly, [petitioner] agrees that she shall use her best efforts in light of her then station in life, age and health, to begin or complete her undergraduate and/or post graduate education and training in order to obtaín employment and otherwise pursue a gainful occupation, and to use her property to generate income for her support and maintenance."

This language immediately followed:

"Notwithstanding the foregoing, [petitioner] agrees to accept, and [respondent] agrees to pay the following periodic sums as maintenance in gross in lieu of any and all rights and claims which [petitioner] may otherwise assert against [respondent] for her alimony, support and maintenance."

In the ensuing paragraphs, the PNA specified the monthly maintenance to be paid petitioner if the proceeding for separation or dissolution was commenced within four years from the date of the

---

[1] https://cpiinflationcalculator.com (last accessed Mar. 20, 2020).

marriage, or, alternatively, after four years but less than seven years from the date of the marriage. In both cases, the PNA prescribed a fixed monthly sum for a definite monthly duration.

¶ 15    Where, however, the proceeding for separation or dissolution was initiated after seven years from the date of the marriage, "then the amount and duration of [respondent's] monthly contribution to [petitioner's] spousal maintenance, alimony and support shall be determined by negotiation of the parties or, failing same, by any court of competent jurisdiction."

¶ 16    In the next two paragraphs, the PNA made two provisos to "the foregoing payments of spousal maintenance and support." First, maintenance "shall be nonmodifiable and, accordingly, [petitioner] shall be precluded from petitioning any court of competent jurisdiction for an increase in said amount or for any modification of [respondent's] obligation to pay spousal maintenance." Second, maintenance would only terminate upon the first to occur of petitioner's death or remarriage; it would not terminate upon respondent's death but would constitute a claim against his estate.

¶ 17    Article 4 also obligated respondent to provide funds for petitioner's further education:

"In addition to the foregoing, [respondent] agrees that if [petitioner] has not begun, prior to the filing of a petition for dissolution of their marriage, an educational program leading to an undergraduate college degree, [respondent] will pay all tuition, fees, books and incidental expenses (but not living expenses) for at least four years of undergraduate college or university education at an institution of [petitioner's] choice."

¶ 18    The parties were married on September 7, 1991, the day after they signed the PNA. The marriage produced one child: a daughter, Shelby, who was born in November 1992 and was emancipated at the time of trial.

¶ 19                              B. Pretrial Proceedings

¶ 20    The parties separated in 2009 when petitioner moved out of Tudor Oaks.  Petitioner filed her dissolution petition in September 2009.  The case did not proceed to trial until October 2016.  In the intervening years, the parties fought bitterly (particularly over discovery) and took several appeals to this court.    Petitioner comments on appeal that the pretrial proceedings were "contentious"—a mild description, we believe, for a level of acrimony and unprofessionalism that we rarely see even in hotly contested dissolution cases.  Countless instances of rudeness and immaturity played out in open court.  At one point, counsel for one party made an obscene gesture toward opposing counsel.  The trial court held counsel in contempt but later vacated the finding.  In this appeal, the parties are each represented by new counsel.  Though some of counsels' language is sharper than we would prefer, we are at least relieved that counsel have not emulated their predecessors' level of incivility.

¶ 21    In September 2010, respondent filed a petition for a declaratory judgment that the PNA was valid and enforceable.  In the ensuing months, petitioner continually claimed that she lacked adequate information as to the completeness of the asset disclosure that respondent provided prior to petitioner signing the PNA.  Accordingly, petitioner claimed that she required further discovery before answering respondent's petition and taking a position on the validity of the PNA.  Not until March 2012 did petitioner file an answer to the petition.  She admitted that she executed the PNA voluntarily, but she refused to admit that she executed it "with full knowledge and/or free of fraud."  In July 2013, petitioner agreed to stipulate to the validity of the PNA on the condition that the stipulation would not limit her right to discovery.  Based on the parties' stipulation, the trial court found that the PNA was "fair and reasonable, valid, not unconscionable and fully enforceable by either party."

¶ 22    Early in the proceedings, petitioner moved for an award of temporary maintenance pursuant to section 501(a)(1) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/501(a)(1) (West 2016)).  The court held a lengthy support hearing at which the parties and several others testified.  Subsequently, in June 2011, the trial court entered an order granting petitioner temporary support.  The court found that petitioner's financial needs were $65,800 per month ($789,600 per year).  Her monthly gross income was $14,533, consisting of $9,533 in wages from her current employment and $5,000 in trust income.  The court ordered monthly maintenance equal to petitioner's shortfall of $51,267.  The court made the support retroactive to December 7, 2009, resulting in an arrearage of $962,488.  The temporary support order remained in effect through trial.

¶ 23    At various times throughout pretrial proceedings, petitioner sought interim awards of attorney fees and costs pursuant to sections 501(c-1) and 508 of the Act (750 ILCS 5/501(c-1), 508 (West 2016)).  The trial court awarded petitioner a total of $1,437,846 in fees and costs prior to trial.

¶ 24    In January 2016, the parties stipulated to the entry of a judgment dissolving the parties' marriage and reserving all remaining issues for trial.  In April 2016, the parties entered into a "Trial Stipulation" that addressed the classification of interests held by respondent and specified petitioner's interests in various Stephenson entities.  The stipulation read in its entirety:

> "The parties, through their respective attorneys, hereby stipulate to the following for the purposes of the trial in this matter on the classification of assets:
>
> 1. The parties agree that all of [respondent's] personal assets and those contained in his revocable trusts including his other interests in assets and business interests, whenever acquired, shall be his separate nonmarital property (as provide for in [the

PNA]). In accordance with Sections 2.1, 2.2, 2.3, and Section 6.0 *et al.* of [the PNA], said property of every kind and character and wherever located which [respondent] has interest in shall be henceforth release from [petitioner's] right or claim arising out of or in connection with [the PNA], excepting therefrom the interests which [petitioner] holds as defined in Paragraph 2.

2. The parties acknowledge that [petitioner] has an interest in the following properties and they shall be subject to further disposition at the next trial. The *status quo* shall be maintained such that neither party shall do anything to diminish the value of [petitioner's] interests in and to the following properties and holdings thereof:

a. A 20% member interest, individually, in Valentino Brown Management Co., LLC.

b. A 1% limited partner interest, through the Alicia L. Stephenson Revocable Trust, in Stephenson II Limited Partnership d/b/a Stephenson Family LP.

c. A 10% limited partnership interest, through the Alicia L. Stephenson Revocable Trust, in International Capital Investment Company, Limited Partnership.

d. A 100% interest, individually, in Stephenson Family Investment, Inc.

e. A 20% interest, individually, in ICMC, LLC.

f. A 50% interest, through the Alicia L. Stephenson Revocable Trust, in Proprietary Interest Holdings, LLC.

g. A 50% interest, through the Alicia L. Stephenson Revocable Trust, in Whitebreeze Holdings, LLC.

h. A 50% interest, through the Alicia L. Stephenson Revocable Trust, in Villa Vista Holdings, LLC.

i. A 50% interest, through the Alicia L. Stephenson Revocable Trust, in Celebration Holdings, LLC.

j. A 50% interest, through the Alicia L. Stephenson Revocable Trust, in Valentino Brown Holdings, LLC.

In the event the Court finds that [petitioner's] aforesaid interests are her separate nonmarital property or the marital property of the parties and the Court awards said interests to [petitioner], the Court will require [respondent] to purchase [petitioner's] interests at the then established fair market value thereof. The classification, valuation, and division of these properties and [petitioner's] claim for permanent maintenance shall be set for setting of trial dates on a future date. ***

3. The parties agree that this stipulation does not include the parties' personal property of jewelry, artwork, household furnishings and automobiles which shall also be reserved for disposition at trial."

¶ 25                                C.  Trial

¶ 26    At the time of trial, petitioner was 52 years old and respondent was 77. The trial occurred over several months in 2016 and 2017. More than 30 witnesses testified, and the court received mountainous documentary evidence. The main issues at trial were: (1) valuation, classification, and division of property, including petitioner's interests identified in the trial stipulation; (2) maintenance; and (3) dissipation.

¶ 27    We divide the trial proceedings into the following topics.

¶ 28        1. Petitioner's Claims for Breach of Contract and Breach of Fiduciary Duty

¶ 29    During trial, petitioner's counsel had occasional colloquies with the trial court over her efforts to present evidence in support of claims[2] for breach of contract and breach of fiduciary duty.  The court was skeptical that these claims were appropriate for resolution in the dissolution proceeding because, in the court's view, petitioner was seeking relief from third parties that were not part of the proceeding.  In all but one or two instances, the court permitted petitioner to present evidence in support of the claims (petitioner does not challenge the exclusion of evidence but relies on other, admitted evidence as to the merits of the claims).  In what follows, we set forth the evidence pertinent to the claims for breach of contract and breach of fiduciary duty.  In doing so, we also provide helpful context for the other issues on appeal.

¶ 30    There are myriad entities within the Stephenson network.  Their relationships were represented at trial by charts of dizzying complexity.  Several companies have confusingly similar names.  For instance, there are three Stephenson entities that bear the full name "International Capital and Management Company."  Two of them are LLCs and one is an LLLP.  The legal names for two of the entities are acronyms—ICMC, LLC, and ICMC, LLLP—while the legal name for the third is its full name, International Capital & Management, LLC.  The difficulty is that these entities are not always clearly distinguished from each other in the testimony and documentary evidence.

¶ 31          a. The Operating Agreements for CASJS Holdings, LLC

---

[22]    As we explain below (*infra* ¶ 164), most of these "claims" were not presented as separate causes of action but as assertions that certain property was petitioner's nonmarital property as defined in the PNA.

¶ 32    Petitioner sought to establish that she was deprived, without her authorization, of her interest in a Stephenson entity, CASJS Holdings, LLC.[3]

¶ 33    The arrangement of the Stephenson entities as of trial was mostly the result of an estate plan and business restructure in 2002 and 2003.  Tax attorney Charles Harris testified that he was the architect of the restructure, which involved the creation of Stephenson entities under the laws of the United States Virgin Islands (USVI) because of its more favorable taxation.  ICMC, LLLP[4], was established in order to provide consulting and management services to other Stephenson entities.  The services included the management of intellectual property.  Harris explained that, in 2004, there were changes in United States law regarding residency and sourcing requirements.  To comply with these changes, ICMC, LLLP, was given a wholly-owned subsidiary with a physical presence in the USVI.  Harris selected as the subsidiary an existing entity, CASJS.  Harris explained that CASJS was part of a group of "shell" companies created at the same time to hold real and personal property subsequently acquired by the parties.  By having a reserve group of entities, the parties avoided the lead time in the formation of a new entity.  In 2007, CASJS was renamed "International Capital and Management Company, LLC" (IC & MC, LLC).

¶ 34    Two operating agreements for CASJS were admitted into evidence.  The agreements have the same effective date of December 23, 2003.  The first agreement reflects that ownership is divided 50/50 between respondent as trustee of the Richard J. Stephenson Revocable Trust (RJS Trust) (established in 1993) and petitioner as trustee of the Alicia L. Stephenson Revocable Trust

---

[3] There is brief mention in the record that CASJS is an acronym containing the names of respondent's children.

[4] LLLP, or "Limited Liability Limited Partnership," is a creature of USVI law.

(ALS Trust) (also established in 1993). Respondent and Michael Coulter Smith were co-trustees of the RJS Trust, while petitioner and respondent were co-trustees of the ALS Trust. The agreement states that each party contributed $500 for initial capitalization. The agreement was signed by petitioner and respondent as trustees of their respective trusts.

¶ 35     The second operating agreement for CASJS reflects 100% ownership by "International Capital & Management Company, LLLP," which Harris explained was the former name of ICMC, LLLP. The agreement shows initial capitalization of $1,000 and is signed by Cornell Williams as chief financial officer of "International Capital & Management Company, LLLP."

¶ 36     In his testimony in petitioner's case-in-chief, Harris acknowledged that CASJS was initially owned by the parties through their respective trusts and that the "change of ownership," *i.e.*, to 100% ownership by ICMC, LLLP, "happened in 2004." However, in his testimony in respondent's case-in-chief, Harris claimed that the operating agreement reflecting joint ownership by the parties' trusts "was never used."

¶ 37     Harris explained that, after the CASJS was renamed, IC & MC, LLC, assumed ICMC, LLLP's, consulting and management duties, leaving ICMC, LLLP, a simple holding company for IC & MC. The primary Stephenson entity for which IC & MC, LLC, provides management and consulting services is CTCA, which in turn provides management services to a group of hospitals, which were five in number as of trial.

¶ 38     Petitioner testified that she was unaware of any change in ownership of CASJS at the time it occurred.

¶ 39     From ICMC, LLLP, the sole owner of IC & MC, LLC, can be traced two branches of ownership that lead ultimately to petitioner. ICMC, LLLP, is owned by two entities, ICMC, LLC, and Valentino Brown Investment Company, LP. ICMC, LLC, holds a 1% general partner interest

while Valentino Brown Investment Company, LP, holds a 99% limited partner interest. Valentino Brown Investment Company, LP, is owned partly by Valentino Brown Management Company, LLC, which holds a 1% general partner interest. Valentino Brown Management Company, LLC, is owned 80% by respondent individually and 20% by petitioner individually. ICMC, LLC, is owned 80% by the RJS Trust and 20% by petitioner individually.

¶ 40 Harris testified that ICMC, LLC, and Valentino Brown Investment Company, LP, were established as holding companies. He explained that the function of the parties' 2002-2003 estate plan, with its various holding companies, was to permit respondent "a mechanism of control over the entities without having to have ownership" with its consequent tax liability.

¶ 41 Also part of the Stephenson network are ICIC, LP, and ICIC, Inc. ICIC, Inc., is a family business office and is owned entirely by the RJS Trust. ICIC, LP, is a "common paymaster" for Stephenson entities other than hospitals. Petitioner has a 10% limited partnership interest, through the ALS Trust, in ICIC, LP.

¶ 42 Petitioner introduced a series of documents from 2013 and 2014 that are signed by Williams as manager of IC & MC, LLC. The documents purport to authorize "distributions" or "dividends" from IC & MC, LLC, to ICMC, LLLP. The total transfers were in excess of $200 million. Dennis Lynde, global managing director for both CTCA and ICIC, Inc., explained that these transfers were made for investment purposes, as ICMC, LLLP, owned two entities that held investments.

¶ 43                  b. Sale of Intellectual Property

¶ 44 Petitioner also sought to establish that intellectual property was sold by a Stephenson entity in which she held an interest and that the sale proceeds were improperly withheld from her. The evidence on this issue was unclear as to which entity held the intellectual property. Petitioner

appeared to claim in her testimony that the intellectual property was held by ICMC, LLC, in which she had a 20% interest in her individual capacity. Other evidence suggested that the intellectual property was held by IC & MC, LLC. The evidence did seem clear, however, that whichever entity held the intellectual property later sold it to Rising Tide, an entity in which petitioner held no interest.

¶ 45                                   c. Income Allocated to Petitioner

¶ 46    Petitioner attempted to prove that documents generated by Stephenson personnel attributed income to her and that this income was improperly withheld from her.

¶ 47    Petitioner introduced into evidence "income allocation" statements from 2006, 2007, and 2008. Petitioner claimed that she received these statements from Stephenson personnel during the marriage. Harris, however, testified that his office prepared the statements during the divorce proceeding.

¶ 48    The statements allocate to petitioner income totaling $31.6 million in 2006, $65.5 million in 2007, and $25.1 million in 2008. The income is attributed to four sources: the ALS Trust, the Stephenson Descendants Trust (SD Trust), Nevis Trusts, and "Schedule D – Capital Gains (50% in trust)." The "Schedule D" income was further noted as coming "mainly through trusts."

¶ 49    Harris testified as to these sources. As part of their 2002-2003 estate plan, the parties established several trusts, including the SD Trust and the RJS Descendants Trust (RJSD Trust). Both the SD Trust and the RJSD Trust were "grantor's" trusts. Under tax laws, the grantor of a grantor's trust must report the trust income on the grantor's individual tax return. Petitioner was the grantor of the SD Trust and respondent was the grantor of the RJDS Trust. Petitioner funded the SD Trust with a $1 million gift from respondent. Respondent funded the RJSD Trust with $600,000. With the initial funds, both trusts purchased interests in Stephenson entities.

¶ 50    Harris explained that petitioner's responsibility as grantor of the SD Trust was to make the initial transfer to fund the trust. Once the transfer was made, she had no control over the operations or distributions of the trust. Moreover, since she was not a beneficiary of the SD Trust, she had no right to any distribution from the trust. Regardless, since petitioner was grantor, she was personally liable for the tax on the trust income.

¶ 51    Harris explained that the Nevis Trusts were grantor trusts created under the SD trust. As with the SD Trust, petitioner was not a beneficiary of the Nevis Trusts and so had no right to receive trust assets. However, since she was the grantor of the trusts, she was personally liable for the tax on the income earned by the trusts.

¶ 52    As for the Schedule D income, Harris testified that "[t]hese were amounts that were in trust," but he did not know whether petitioner received them. Harris was not asked about the income allocated to petitioner from the ALS Trust.

¶ 53    Harris testified that, when he established the grantor's trusts, he did not anticipate that petitioner would pay the income tax with her own funds. Rather, he assumed that, because the parties filed joint returns, respondent would pay the tax with his funds.

¶ 54    Harris further stated that, eventually, the assets of the RJSD Trust and the SD Trust were transferred to the Celebrate Life Trust, which, as a "complex" trust, paid its own taxes. Thus, the parties were relieved of their tax liability.

¶ 55    Petitioner testified that, during the marriage, she received the income allocation statements in question from Lynde and Phillip Picchietti, who was the chief financial officer of ICIC, Inc. Petitioner claimed that she did not receive the income allocated to her on the memos. She was aware that the income was reported on the parties' joint tax returns, but she did not know how the tax was paid.

¶ 56    Petitioner testified that, in 2009, she began filing her taxes separately.  From 2009 until the time of trial, she received K-1 forms reflecting income from several Stephenson entities in which she or her trust, the ALS Trust, held interests.  The entities were ICMC, LLC; ICIC, LP; Stephenson Family Investment, Inc., and Valentino Brown Management Company, LLC (all of these interests were listed in the trial stipulation).  She did not receive any of the income reflected on the K-1 forms but was still liable for the taxes on it.  She asked Stephenson personnel for funds with which to pay the taxes, but they informed her that respondent would not allow it.  As of trial, respondent had paid $251,000 in taxes on the K-1 income.

¶ 57                    d. Remaining Interests Specified in the Trial Stipulation

¶ 58    In the preceding sections, we referenced the following entities in which petitioner held interests, as stipulated by the parties:  ICIC, LP (through the ALS Trust); ICMC, LLC (individually); Stephenson Family Investment, Inc. (individually); and Valentino Brown Management Company, LLC (individually).  The remaining stipulated interests were in various holding companies, some of which held real or personal property.  The record shows that petitioner did not herself pay for any of the stipulated interests.

¶ 59                          e. The Trial Court's Comments

¶ 60    As noted, during the multiple times in which the subject arose during trial, the court expressed doubt that it had authority to adjudicate petitioner's breach claims.  The following comments are representative of the court's skepticism:

“As far as [petitioner] not getting income from things she should have got income from, those entities, if your theory is correct, may owe her money; and she may have causes of action against those entities.  That's not a function of this dissolution of marriage case.  There's nothing I can—to my knowledge, that I can do about it.”

However, the court took no definitive position at that time, and, for the most part, permitted petitioner to present evidence in support of those claims.

¶ 61                                    2. Maintenance

¶ 62    Petitioner presented copious evidence with respect to maintenance. We direct most of our attention to the marital lifestyle, as this is the sharpest point of contention on appeal. The parties agreed at trial that the relevant time period for judging the marital lifestyle was 2004 to 2007.

¶ 63                        a. Financial Limits During the Marriage

¶ 64    Petitioner attempted to show that the parties spent their money without regard to budgeting. She testified that there was virtually no limit on what she could spend on jewelry, artwork, gifts, parties, and trips.

¶ 65    Kristie Lennon, an interior designer, testified that she helped plan the parties' 1991 wedding and was also involved in renovations of the parties' homes. On these projects, budget was never an issue. Never was "any cost or luxury too expensive."

¶ 66    Lynde testified that, while the parties "had the lifestyle of a wealthy couple," petitioner "absolutely" had to be "concerned about what money she was spending."

¶ 67    The parties' joint federal tax returns for 2005, 2006, and 2007, stated yearly total income of $45.2 million, $83.9 million, and $157.8 million, respectively.

¶ 68                        b. Belmonte Newman's Analysis

¶ 69                                    i. Sources

¶ 70    Petitioner retained Cathleen Belmonte Newman to prepare an analysis of petitioner's post-divorce needs based on the lifestyle she enjoyed during the marriage. Belmonte Newman prepared a report, which was admitted into evidence, and she testified in support of it.

¶ 71    Belmonte Newman claimed that she reviewed 1600 separate documents in preparing her analysis, yet she never "had a case where the lack of *** documents was as large as it was in this case." Belmonte Newman testified that a "traditional" marital lifestyle analysis is based on "the historical bank statements and credit card statements of the parties during their marriage." In this case, only a "small percentage" of Belmonte Newman's analysis was based on bank records and credit card statements, because she was provided so few of them. For the remainder of her analysis, Belmonte Newman resorted to petitioner's recollection of the parties' spending habits, from which Belmonte Newman formed certain assumptions about the marital lifestyle. Belmonte Newman then tested those assumptions against the following sources: (1) "anecdotal" evidence of the parties' expenses such as photos, emails, and letters; (2) financial statements prepared by the parties during the marriage; (3) household budgets prepared for the various properties owned by the parties; (4) inquiries to professionals about the cost of various high-value items for which an expense history was not available; and (5) financial affidavits prepared by the parties during the litigation.

¶ 72    The parties prepared financial statements for the years 2005, 2006, and 2007. Lynde explained that the statements were generated in order to support respondent's personal guaranty on a line of credit. The following table is drawn from those statements and includes the parties' reported net worth, income, and personal use assets:

|  | 2005 | 2006 | 2007 |
| --- | --- | --- | --- |
| Net Worth | $433,930,131 | $505,257,795 | $435,750,083 |
| Annual Income | $5,015,871 | $5,015,871 | $5,074,243 |
| Real Estate | $20,450,000 | $20,450,000 | $30,250,000 |
| Automobiles/Motorcycles | $1,110,209 | $1,110,209 | $1,039,767 |

| Vehicles/Recreational Vehicles (*e.g.*, boats) | $1,114,309 | $1,114,309 | $1,074,415 |
|---|---|---|---|
| Aircraft | $234,000 | $234,000 | $234,000 |
| Collectibles (*e.g.*, furniture, jewelry, furs) | $8,578,666 | $8,674,454 | $8,934,454 |

¶ 73    Belmonte Newman also relied on household budgets for the entities that held four of the parties' homes: Buckley Road Properties (Tudor Oaks), Villa Vista Holdings, LLC (the parties' home in the USVI), Denver Mountain Chalets, Inc. (the parties' home in Snowmass, Colorado) and Leland (the parties' home in Leland, Michigan). Lynde testified that these reports were generated annually under his supervision. In 2006 and 2007, the four households reported yearly combined expenses of $2 to $2.5 million. The reports reflect various operational expenses such as mortgage, staff, security, maintenance, and groceries. Belmonte Newman noted that the budgets do not reflect the parties' personal expenses such as for clothing, grooming, entertainment, travel, and medical care. Petitioner told Belmonte Newman that the Stephenson organization maintained budgets for the parties' personal expenses, but, to Belmonte Newman's knowledge, respondent had not turned over any such records in the proceeding.

¶ 74    Belmonte Newman testified that she also received bank records and credit card statements, but these were not comprehensive in terms of years or institutions.

¶ 75    Another source on which Belmonte Newman relied was respondent's June 2016 financial affidavit, which he submitted pursuant to local rule. Respondent reported $318,636 in monthly living expenses, comprised of $297,697 in household expenses, $2,287 in transportation expenses, and $16,652 in personal expenses. He reported $346,665 in monthly net income, leaving a surplus of $28,029 per month. Belmonte Newman noted that respondent's affidavit provided no expense figures in the following categories: car payments, parking, alternative

transportation (taxis, buses, trains), life insurance, vacations, club membership dues, and donations.

¶ 76    Belmonte Newman created the following chart comparing the parties' marital lifestyle with petitioner's projected post-divorce lifestyle.

|  | Marital Lifestyle | Petitioner's Post-Divorce Lifestyle |
|---|---|---|
| Gross Value of Real Estate Owned | $26 - $30 million (not including AZ home) [5] | $9,100,000 |
| Number of Primary Residences | 5 | 2 |
| Monthly Living Expenses | $318,636 + expenses paid through entities | $433,991 |
| Monthly Housing Expenses | $297,697 (not including AZ home) | $165,123 |
| Number of Motor Vehicles | At least 9 Autos, at least 8 Motorcycles, and at least 11 Watercraft | 4 Autos, 4 Motorcycles, 6 Watercraft |
| Club Memberships | At least 8-10 | 2 |
| Household and Personal Staff | At least 8-12 | 3 |
| Access to Private Aircraft | Company Owned. No Limit to Access | Through Third Party Provider; limited to 141-200 flight hours per year |
| Limitations on spending | None | Will live on a budget |

¶ 77    For the marital lifestyle, Belmonte Newman drew the $318,636 for monthly living expense, and the $297,697 for monthly housing expenses, directly from respondent's June 2016 financial affidavit despite its remoteness in time from when the parties were living together.  In her report, Belmonte Newman determined that, for petitioner to maintain a post-divorce lifestyle "consistent with the nature of the Stephenson marital lifestyle," she would require income of

---

[5] Respondent purchased a home in Arizona after the parties separated.

$433,991 per month, net of income taxes. This figure was comprised of the following categories of expenses: $165,123 in household expenses, $16,554 in transportation expenses, and $252,314 in personal expenses.

¶ 78    Belmonte Newman's report caveated that $433,911 per month would afford petitioner only a "modest version" of the marital lifestyle and would "not capture the true grandeur and luxury" of that lifestyle. In her testimony, Belmonte Newman noted that respondent's tally in his June 2016 affidavit of $318,636 in monthly expenses did not include certain expenses. She proposed that, when adjusted for those missing expenses, plus expenses paid for respondent by Stephenson entities, his monthly expenses would actually exceed the $433,991 that Belmonte Newman proposed for petitioner's monthly expenses.

¶ 79    In what follows, we set forth Belmonte Newman's bases for the most significant expenses in each of the three main categories: household, transportation, and personal.

¶ 80                             ii. Household Expenses ($165,123 per month)

¶ 81    *Homes ($86, 129 per month for the purchase of two homes and a summer rental)*

¶ 82    The parties had five homes during the marriage. The marital residence was Tudor Oaks, a 120-acre estate. Buildings on the estate include the 30,000 square-foot main home, a pool house, horse stables, and at least one other residence. The parties had three additional homes in Leland, Michigan, Snowmass, Colorado, and St. Thomas, USVI. There was extensive testimony from petitioner and other witnesses that the homes were situated in prime locations, were spacious (the Leland home was 5,000 square feet) and had luxurious furnishings and decorations. Tudor Oaks was renovated several times during the marriage. The Snowmass and Leland homes were also renovated. The parties also had a condominium in Tennessee. Belmonte Newman accepted respondent's estimate, in his June 2016 affidavit, that the five homes had a combined value of

$26 to $30 million. Belmonte Newman did not consider an Arizona home that respondent acquired after the parties separated.

¶ 83 According to the parties' testimony, they spent about two weeks per year at Snowmass and about two to four weeks per year at Leland. Petitioner testified that the parties travelled for almost every spring break. They would typically go to Florida or the USVI. The parties would spent two to four weeks at a time at the USVI home. Both parties testified that their visits to the USVI home were a mix of pleasure and business (IC & MC, LLC, had its offices in the USVI).

¶ 84 Belmonte Newman's analysis allowed for two primary residences for petitioner. Petitioner desired to have a residence in downtown Chicago and another in Florida. The latter would correspond to the USVI home. Belmonte Newman referred petitioner to a realtor, who found a 4-bedroom, 4,000 square-foot condominium in downtown Chicago with a list price of $4.4 million. Belmonte Newman estimated that the mortgage (15-year at 3.5%), real estate taxes, and assessments (utilities, parking, maintenance) on the Chicago condo would total $32,393 per month.

¶ 85 Belmonte Newman located a condominium in Naples with a purchase price of $4.6 million. She estimated that the mortgage (15-year at 3.5%), real estate taxes, and assessments (homeowner's association, country-club dues) on the Naples home would total $30,444 per month.

¶ 86 Belmonte Newman also allowed for a summer rental in Michigan as a substitute for the Leland home. In order to save costs, Belmonte Newman and petitioner decided on a rental rather than a purchase. Petitioner desired a rental that was located, like the Leland home, on Lake Michigan. Based on her research, Belmonte Newman estimated $23,292 per month for the rental of a three-bedroom home on Lake Michigan from May through September.

¶ 87    *Furniture/Decorations ($53,351 for three homes, amortized over 10 years)*

¶ 88    According to petitioner, the furniture that the parties purchased during the marriage was of "very high quality." They used designer fabrics from Ralph Lauren and other sellers. Tudor Oaks had particularly fine furnishings. The parties purchased many pieces of artwork, some of which they had commissioned. Floral arrangements that cost $300 to $500 each were delivered to Tudor Oaks on a weekly or biweekly basis.

¶ 89    Belmonte Newman budgeted for furniture, since it was her understanding that petitioner took little furniture when she separated from respondent. Belmonte Newman referred petitioner to an interior designer, Jessica LaGrange, who submitted a proposal for $1.8 million for the Chicago condo. The proposal included the cost of furniture and artwork ($1.1 million), a design fee ($300,000), and construction costs ($400,000) (painting, renovating the kitchen, sealing furniture fabric, updating electrical and HVAC). For the Naples home, LaGrange proposed $1.4 million, comprising the same categories of costs.

¶ 90    Belmonte Newman also had LaGrange provide a furniture proposal for a home in Barrington's Wynstone subdivision. Respondent had purchased the home for petitioner after their separation. Petitioner testified that she was refusing to move into the Wynstone home because it needed renovation and because respondent insisted on placing the home in a trust over which she had no control. LaGrange's furniture proposal for the Wynstone home was $1.2 million.

¶ 91    *Staff (3 personnel at $18,435 per month)*

¶ 92    The evidence at trial was that the USVI home had 2 on staff while Tudor Oaks had as many as 15 on staff. Staff included housekeepers, a chef, a vehicle manager, a horse breeder and trainer, and drivers. Each party also had a personal assistant. Petitioner testified that, if she starts

her own business, or has multiple homes, she will need a personal assistant for help with management.

¶ 93    Belmonte Newman made provision for a full-time household staff of three to assist petitioner:  a personal assistant, a housekeeper, and a chef.  She based her cost calculations on information from placement agencies.  Belmonte Newman compared her recommendation to respondent's averment in his June 2016 financial affidavit that he employs a staff of 8 to 12.

¶ 94                            iii. Transportation Expenses ($16,554 per month)

¶ 95    During the marriage, the parties owned multiple cars, many of them luxury models such as Mercedes and Porsche.  They gifted each other luxury cars for special occasions.  In addition to cars, the parties had a limousine at their disposal.  As avid motorcyclists, the parties owned several motorcycles and took yearly motorcycle trips.  They also owned several watercraft including two yachts (a 92-footer and a 50-footer).  The parties employed a vehicle manager who was responsible for maintaining the vehicles stored at Tudor Oaks and the Leland home.  The vehicle manager would also deliver vehicles to the Leland home and other vacation sites.  Also during the marriage, the parties had access to aircraft that were owned by Stephenson entities within respondent's control.

¶ 96    Belmonte Newman's allocation for transportation expenses would fund the purchase of four automobiles (Audi, $5,229 per month, amortized), four motorcycles (Harley Davidson, $1,070 per month, amortized), and six watercraft (four personal watercraft and two boats, $9,690 per month, amortized).  She compared this recommendation to respondent's statement in his June 2016 affidavit that he owns at least 9 automobiles, at least 8 motorcycles, and at least 11 watercraft.   Petitioner would divide the automobiles between her Chicago and Florida residences, and the watercraft between her two homes and the rental home.  Belmonte Newman made no

provision for petitioner to purchase her own aircraft, but she allowed a monthly expense for charters of private planes for vacation travel.

¶ 97                                  iv. Personal Expenses ($252,314 per month)

¶ 98    *Vacations ($104,147 per month)*

¶ 99    Petitioner testified to the parties' domestic and international travel during the marriage. Petitioner claimed to have visited 34 countries during the marriage. She visited many of these countries during a 2002 worldwide trip that the parties took with Shelby. The trip lasted about eight or nine months. The parties brought along a nanny who tutored Shelby. Petitioner described this trip as recreational, though respondent did conduct some business along the way. The parties stayed mostly in four-star hotels for the trip.

¶ 100   Petitioner testified to other international trips. She characterized many of them as purely recreational. Some had a business component, such as trips to Germany and Austria to purchase horses for the equestrian business at Tudor Oaks.

¶ 101   As to domestic travel, petitioner testified that she visited 20 states and Washington D.C. during the marriage. Some of this domestic travel was purely for business, such as trips to research sites for new hospitals. Some of it was purely recreational, such as annual motorcycle trips to Sturgis, annual attendance at the Super Bowl, and less regular attendance at the Rose Bowl and the Olympics. On some occasions, the parties were accompanied by CTCA employees, but the trips were nonetheless recreational. Some of the parties' close friends were CTCA employees.

¶ 102   According to respondent, he has "investment interests all around the world," and his travel is "all wrapped in so much business activity." He claimed that the parties were busy with business 99% of the time during their travels.

¶ 103    Other witnesses at trial were asked to characterize the parties' travel.  Lynde testified that "every trip [with respondent] is a business trip because we discussed business—or a new venture or an old venture on every trip."  Lynde noted that, on the several occasions when he travelled with respondent to the USVI, "it was always *** business," and "there was never really pleasure."  Stephen Bonner, former president and CEO of CTCA, testified that he never travelled with the parties on Stephenson aircraft for purely social purposes.  Picchietti testified that most of the trips he took with respondent had a business element to them but were not purely for business.  Robert Mayo, former vice-chairman of CTCA, testified that most of his social events with the parties had "dual purposes," *i.e.*, "[t]hey were social, but always included some sort of a business type of trip."

¶ 104    Belmonte Newman testified that she allocated expenses for domestic travel alone.  She allowed for several flights per year between Chicago and Naples and between Chicago and Michigan.  She also budgeted for travel to events that petitioner expressed a desire to attend on a yearly basis: the Rose Bowl, the Super Bowl, the Sundance Film Festival, Bike Week, Fashion Week, Concours d'Elegance Car Show, the U.S. Open (tennis), and Napa Valley Harvest.  Belmonte Newman allowed as well for a yearly vacation to Cabo San Lucas, Mexico .  Estimated monthly cost for private flight to these destinations was $81,784.  Entertainment, dining, and hotels at these destinations was estimated at $22,363 per month.

¶ 105    *Clothing/Shoes/Accessories ($30,123 per month)*

¶ 106    Belmonte Newman acknowledged that she had no bank or credit card records from which to determine what petitioner spent on clothing during the marriage.  She consulted the parties' 2005, 2006, and 2007 financial statements, which listed several fur coats including one valued at $19,500.  She also relied on petitioner's estimate that she spent $250,000 per year, or $20,833 per

month, on clothing. According to Belmonte Newman, petitioner claimed that she was currently spending $10,000 per month on clothing.

¶ 107 Petitioner testified that, during the marriage, she purchased clothing from stores such as Neiman Marcus, Nordstrom, Escada, and Star Couture. She had custom clothing made for her. She purchased five or six suits a year. She also purchased much formal wear because she attended many fundraising galas in her positions in the Stephenson businesses. Since the separation, petitioner could not afford to attend as many galas, but she wanted to increase her attendance. She claimed that she was currently spending "close to" $10,000 per month on clothing. While she did not currently need work clothes because she was not employed, she was purchasing clothing for her court appearances. Whether she would continue to need $10,000 per month for clothing would depend on what she did in the future.

¶ 108 *Care for Petitioner's Mother ($30,000 per month)*

¶ 109 Petitioner called her mother, Marguerite Valentine, in her case-in-chief. Petitioner claimed that Valentine's testimony was relevant because the parties had been caring for her at Tudor Oaks and, therefore, those expenses were part of the marital lifestyle. Petitioner also noted that, as of trial, respondent was still caring for Valentine at Tudor Oaks. The trial court barred Valentine's testimony because it knew of no basis in Illinois law for requiring respondent to provide support for a former mother-in-law.

¶ 110 Respondent objected again later when Belmonte Newman testified to the amount that she was allocating for petitioner's post-divorce support of Valentine. On this occasion, the court overruled the objection, stating that it would receive the evidence and decided later whether care for Valentine was part of the marital lifestyle for purposes of setting maintenance.

¶ 111 Petitioner testified that Valentine moved into Tudor Oaks in 1994 to assist petitioner in raising Shelby. Subsequently, Valentine suffered a stroke and began needing a full-time caregiver. During the marriage, the parties paid for Valentine's support including her caregiver. Valentine was currently still residing at Tudor Oaks and receiving appropriate care and support at respondent's expense. Belmonte Newman's estimate included Valentine's personal expenses, health insurance, medical expenses, caregiver expenses, and household expenses (including mortgage payments on a Tennessee home that Valentine owned).

¶ 112 *Donations and Charity ($29,166 per month)*

¶ 113 From 2005 to 2009, petitioner was chair of the Cancer Research Treatment Foundation, which later became known as Gateway. Gateway was the fundraising wing of CTCA. Petitioner also raised funds for several other charities. Petitioner testified that she and respondent enjoyed attending charity galas and gave generously to charity. Petitioner desired to continue her contributions of time and money to charity.

¶ 114 Belmonte Newman testified that petitioner expressed an interest in attending four or five charity galas per year at $20,000 to $25,000 per event. Petitioner also expressed an interest in making donations of $250,000 per year.

¶ 115 *Local Entertainment, Dining Out, and Hobbies ($26,373 per month)*

¶ 116 During the marriage, CTCA owned 12 Chicago Bears season tickets as well as a box at the United Center that included 12 season tickets for the Chicago Bulls and Blackhawks. The tickets were used for business and personal purposes. Petitioner testified that the parties were loyal Bears and Bulls fans and would take friends to games. Respondent testified that the tickets were used for entertaining business associates, but sometimes petitioner went to games just with friends. Petitioner testified that the parties also enjoyed attending concerts and Broadway shows.

According to petitioner, the parties dined out three nights per week. "[A] lot of these dinners were for business," but petitioner noted that some of respondent's business associates were also his friends.

¶ 117   According to petitioner, the parties used a limousine for "special events." Petitioner also testified that the parties enjoyed wine and had a 1,500-bottle wine collection.

¶ 118   Belmonte Newman budgeted for a 20-ticket suite at Soldier Field for the Bears' 10 home games and 4 tickets for an additional 8 events per year (at $500 per ticket). Belmonte Newman included meals and limousine service for each outing. The total for all events was $18,984 per month.

¶ 119   For dining out, Belmonte Newman budgeted for 10 restaurant meals for two per week, for a monthly total of $5,439. She also budgeted $1,950 per month for wine purchases (10 bottles at $75 each and 6 bottles at $200 each).

¶ 120   *Club Membership Dues ($3,072 per month)*

¶ 121   In her report, Belmonte Newman stated that petitioner desired to join several clubs in Chicago and Naples, including the East Bank Club in Chicago and the Grey Oaks Country Club in Naples.

¶ 122   In her testimony, petitioner identified several clubs that the parties belonged to during the marriage. Petitioner desired to join a country club and perhaps live in a country club community.

¶ 123   *Special Events ($8,333 per month)*

¶ 124   Petitioner presented evidence that the parties spent considerable amounts on celebrations. Donna Bliss, a corporate event planner, testified that she planned 14 separate events for the parties. She planned their 1991 wedding, which occurred on the grounds of Tudor Oaks. There was a "city of tents," horse-drawn carriages, a heralding trumpeter, and a flyover of jets.

(Respondent had proposed to petitioner with an engagement ring valued at over $300,000.) Bliss did not estimate the cost of the wedding but did provide costs for subsequent celebrations: $225,000 for the parties' 5th anniversary party, $70,000 for their 10th anniversary party, $340,000 for petitioner's 40th birthday party, and $48,000 for Shelby's 16th birthday party.

¶ 125    In her report, Belmonte Newman stated that petitioner anticipated spending $250,000 every five years for a major family celebration and $50,000 annually for smaller parties for Valentine, Shelby, and petitioner's friends.

¶ 126    Petitioner testified that she intends to hold, as she did during the marriage, "lavish, extravagant, and very expensive events for the big events in [her] family."

¶ 127    *Gifts ($2,733 per month)*

¶ 128    There was evidence at trial that the parties exchanged lavish gifts such as luxury cars and diamond jewelry. The parties gave Shelby a Jeep for her 16th birthday and a Porsche when she went to college. The parties were also generous towards their friends, one of whom they surprised by paying the balance due, after deposit, on her wedding. Another friend received free cancer treatment from CTCA. CTCA employees received cars and motorcycles as gifts.

¶ 129    Petitioner currently spent $2,733 per month on gifts. Belmonte Newman did not budget any amount above what petitioner currently spent.

¶ 130                              B. Earning Capacity

¶ 131    When petitioner met respondent, she was working in "sales and personal shopping." In 1987, respondent supplied petitioner with a townhome, a car, and financial support. She moved into Tudor Oaks in 1988 or 1989. In 1990, she earned an associate degree in fashion merchandising.

¶ 132 Petitioner testified that she had various roles within the Stephenson business. She provided input in the selection of hospital sites, interior design, staff, and board members. She was president of several Stephenson entities including ICMC, LLC, and was a board member of Eastern Medical Center, a CTCA hospital. She participated in board meetings for these and other Stephenson entities. As chair of Gateway, she was involved in reformulating its strategic plan and did considerable fundraising for CTCA, particularly through Gateway's charity galas. Respondent recognized at trial that petitioner served "well" at Gateway and "helped round up a lot of money." Petitioner was paid $100,000 annually for her work at Gateway. Petitioner estimated that she was at home with Shelby about 25% of the time, but even then she was still planning Gateway galas.

¶ 133 Petitioner noted that, though respondent offered in the PNA to pay for her to obtain an undergraduate degree, he in fact did not want her going to school but "wanted her by his side every second of every day." She later testified that the issue of her education was "never discussed." She had no time to pursue a degree during the marriage and did not believe that further education would have necessarily helped with her work in the Stephenson business. She did not pursue a degree during the separation for various reasons: the divorce proceedings have consumed a lot of her time, she has suffered from depression, she does not know what to study, and she has felt "lost."

¶ 134 Petitioner has not applied for a job since 2007. She will "move forward" once she knows where she will be living and gets settled into a home. She has no desire to work in a hospital setting and does not believe that her work with the various Stephenson entities qualifies her for such work without further education. Recently, however, she joined the board of a hospital. Petitioner believes she is qualified for a job in fundraising though she has not applied for one. In

2011, she created an LLC called Valentino Design, which she intended to develop into a clothing company, but she has lacked the funds to start the business. Petitioner is currently pursuing teaching certificates in yoga and Pilates. Her goal is to own a teaching studio.

¶ 135   Petitioner testified that she desires a "simpler" life after her divorce. She wants more time for socializing and vacations than she had during the marriage, when she and respondent were frequently busy with the family business.

¶ 136   Steve Gonzalez, a financial adviser with Alliance Bernstein, testified that, in December 2012, petitioner deposited $500,000 with him. Gonzalez invested the funds in a diversified portfolio. Petitioner introduced into evidence Gonzalez's written analysis of how much wealth petitioner would need to support a given amount of expenditures per year for the remainder of her expected lifespan. Gonzalez assumed a median rate of return of 6.9%. He noted that, since 2012, petitioner has earned "a hair below" that median return.

¶ 137   Respondent described himself at trial as a merchant banker and philanthropist. In respondent's testimony in petitioner's case-in-chief, the subject turned to respondent's ability to pay maintenance. Counsel for respondent objected that respondent had already testified on that issue. The trial court then asked counsel if respondent was willing to agree that he could afford to pay petitioner maintenance of $400,000 per month after taxes, which was the amount she requested in her opening statement. Counsel replied, "I think the answer is yes and all you have to do is look at [respondent's] tax returns, Judge." The court accepted counsel's statement "as an admission that [respondent] has the ability to pay what [petitioner] requested."

¶ 138   Several weeks later, when continuing his examination, respondent denied that he had the resources to pay petitioner $400,000 monthly net of taxes. Respondent, however, never formally

withdrew the stipulation to his ability to pay[6] (and the trial court cited the stipulation in its dissolution judgment). In his individual federal tax returns from 2012 to 2015, petitioner reported yearly total income between $9.2 and $16.1 million.

¶ 139  After the close of evidence, petitioner filed a petition for contribution to fees and costs pursuant to section 508(a) of the Act (750 ILCS 5/508(a) (West 2016)).

¶ 140                                3. The Dissolution Judgment

¶ 141  In September 2017, several months after the close of evidence, the trial court issued its judgment resolving all outstanding issues. First, the court determined that the interests listed in the trial stipulation were petitioner's nonmarital property. The court found that respondent, for estate planning purposes, "divested himself from complete ownership and control of a part of his non-marital estate by creating the entities listed in the trial stipulation" and by giving petitioner ownership interests in the entities. Petitioner obtained her interests through gifts from respondent, by which he intended to "forever giv[e] up dominion over the property transferred." The resulting form of ownership was not joint tenancy or joint ownership, otherwise the transfers would have been ineffective, under article 2 of the PNA, to transmute the property from respondent's nonmarital property to petitioner's nonmarital property. Rather, "[respondent's] plan and divestiture [was] beyond the terms of the [PNA] that would otherwise require revestment of [petitioner's] interests to [respondent]" in the event of separation or divorce.

¶ 142  The court then considered the evidence as to the value of petitioner's interests and decided on a total value of $6,519,282. The court directed respondent to pay this amount to petitioner.

---

[6] In fact, prior to respondent continuing his testimony, his counsel relied on the stipulation in order to forestall further testimony from other witnesses as to his ability to pay.

¶ 143   Next, the court apportioned personal property between the parties.  The court noted that petitioner had the following accounts: (1) an investment account at Alliance Bernstein with a balance of $473,942;[7] (2) an account at Barrington Bank and Trust with a balance of $30,000; (3) a 401(k) account with a balance of $30,000.  The court classified these accounts as marital property but awarded them to petitioner.  The court also noted that petitioner accumulated substantial jewelry during the marriage.  The court determined that the jewelry were gifts from respondent and, hence, were petitioner's nonmarital property.  The court awarded petitioner the jewelry, which was valued at $4,054,127.

¶ 144   The court next addressed petitioner's request for maintenance.  The court first considered the PNA.  The court noted that the PNA required respondent to provide petitioner with funds to purchase a residence with a maximum price of $250,000 as of 1991 (or $450,000 as of 2017).  The court remarked:

> "Absent other factors the court could consider a modest monthly maintenance award for [petitioner] to live in this type of residence.  However, there are other factors for the court to consider."

¶ 145   The court then addressed respondent's argument that petitioner was precluded from receiving maintenance because she did not make reasonable efforts to become self-supportive.  Respondent relied on article 4 of the PNA, which provided that, in the event of a divorce

---

[7] This was the balance shown in Gonzalez's written analysis, dated October 1, 2014.  Gonzalez testified that the balance had since decreased to $370,000.  Nonetheless, the trial court used $473,000 (rounded down), and petitioner has not challenged that figure on appeal.

proceeding, petitioner "shall have the primary responsibility for her individual maintenance and support." The court rejected respondent's position:

"The court recognizes [petitioner] could have taken further action to obtain a degree or training to obtain gainful employment. However, even if [petitioner] was earning similar money to her Gateway salary, or the court were to impute similar income, she would be unable to duplicate the lifestyle enjoyed during marriage. Permanent maintenance is appropriate when a spouse is underemployed or employed at an income that is substantially lower than the previous standard of living."

¶ 146 The court noted that, due to the length of the marriage, the PNA made the duration and amount of maintenance subjects for the parties' negotiation, and, if need be, court adjudication. The court thus turned to section 504 of the Act (750 ILCS 5/504 (West 2016)), which addresses maintenance. Section 504(a) lists factors that determine whether an award of maintenance is appropriate in the first instance. If the court determines that an award of maintenance is appropriate, the court turns to section 504(b-1) to determine the amount and duration of maintenance. Section 504(b-1)(1) provides a mathematical formula to determine maintenance "[i]n situations when the combined gross income of the parties is less than $250,000 and the payor has no obligation to pay child support or maintenance or both from a prior relationship, *** unless the court makes a finding that the application of the guidelines would be inappropriate." 750 ILCS 5/504(b-1) (West 2016)). Section 504(b-1)(2) provides that non-guideline maintenance is determined in accordance with the factors in section 504(a). 750 ILCS 5/504(b-1)(2) (West 2016).

¶ 147 Applying the factors in section 504(a), the trial court determined that an award of maintenance was appropriate. Turning to section 504(b-1), the court found the guidelines

inapplicable because "[respondent's] income exceeds $250,000 and the parties stipulated [that] [respondent] has the ability to pay an award as high as $400,000 per month." Therefore, the court referred back to section 504(a) to determine the amount and duration of maintenance. The court found that nearly all factors favored petitioner. The court specifically addressed the evidence on the marital lifestyle. The trial court's critical finding was that, though the parties "enjoyed a very lavish lifestyle during the marriage," it was "unnecessary for [respondent] to fund purchases described by Belmonte Neuman [*sic*] for [petitioner] to enjoy a similar lifestyle," as petitioner could "access opulent accommodations without the added expense of ownership."

¶ 148 In setting maintenance, the trial court considered the $6.5 million in property that it awarded petitioner. The court noted Gonzalez's testimony that petitioner was receiving a yearly median return of 6.9% on the $500,000 that she invested with Gonzalez in 2012. Accordingly, even accounting for expenditures, it was "reasonable to infer from the evidence that [petitioner] may realize income of $400,000 per annum [on the $6.5 million] without invading principal." The court also noted that petitioner had a combined $60,000 in a bank account and a 401(k). The court found that petitioner's "potential use of investment income satisfies her contractual duty to primarily support herself as agreed in the [PNA]."

¶ 149 The court also commented that petitioner's "future tax liability is significant." First, petitioner will be liable for tax on any maintenance award and for property taxes on any home she purchases. Second, petitioner has tax liability in relation to the Alicia L. Stephenson Irrevocable Trust, which she created "using a $1,000,000 gift from [respondent] to transfer wealth to Shelby and other beneficiaries." The court went on:

"[Petitioner] receives no income from the trust but is liable for significant income taxes generated. This was no problem when the parties filed joint returns as the taxes were

apparently paid from [respondent's] income. This benefit no longer exist[s] as each party files separate tax returns and [petitioner] does not have access to other income."[8]

¶ 150   The court decided upon maintenance of $55,000 monthly. The maintenance would be "permanent" and would "continue until termination as stated in *** [the PNA]." The court also directed that petitioner "receive the requisite funds for a home purchase and college education as stated [in the PNA]."

¶ 151   The trial court denied petitioner's claims of dissipation (she does not challenge that aspect of the trial court's judgment in this appeal).

¶ 152   The court then took up petitioner's contribution claim. Petitioner sought contribution for attorney fees and costs incurred in the trial proceeding, prior appeals in this case, and auxiliary litigation in other counties. After deducting petitioner's costs and fees that were not proved, were waived, or were not reasonable and necessary, the court arrived at a total of $3,350,921 in allocable fees and costs. The court ordered respondent to contribute $2,000,000 to those fees and costs. After a credit for the interim fees respondent paid, he owed a balance of $562,154.

¶ 153   The court did not address petitioner's claims for breach of contract and breach of fiduciary duty.

¶ 154   Petitioner appealed. Respondent filed a notice of cross-appeal but did not file a cross-appellant's brief.

¶ 155                                   II. ANALYSIS

¶ 156                           A. Respondent's Motion to Dismiss

---

[8] As explained below (*infra* ¶ 193), the trial court appears to have the wrong trust in view.

¶ 157 Before proceeding to the merits, we address respondent's motion to dismiss petitioner's appeal. Respondent relies on the "release of errors" doctrine. "In the context of a divorce action, the doctrine of release of errors bars an appeal if, by reason of the nonmovant accepting benefits of the judgment appealed from, the movant would be distinctly disadvantaged were the judgment reversed." *In re Marriage of Brackett*, 309 Ill. App. 3d 329, 336-37 (1999). Under the release of errors doctrine, "[t]he existence of a distinct disadvantage is the critical inquiry, and the movant bears the burden of establishing its existence." *Id.* at 337. Respondent notes that he has paid the $6.5 million for petitioner's interests in the Stephenson entities and the $562,154 in attorney fees, and is currently paying petitioner the required maintenance of $55,000 per month. Respondent contends that, "[s]hould [he] be successful in his cross-appeal challenging the judgment, he will be placed at a distinct disadvantage if [petitioner] is unable to satisfy the terms of the appellate court opinion on remand." However, he also acknowledges that "reviewing courts have refused to dismiss an appeal based upon the release of errors doctrine when the party seeking dismissal has not cross appealed the trial court's judgment." For this proposition, he cites *In re Marriage of Kusper*, 195 Ill. App. 3d 494, 501 (1990), where the appellate court held that the release of errors doctrine did not bar the wife's appeal of the dissolution judgment awarding her maintenance and dividing the parties' property. The court reasoned that, because the husband had not cross-appealed the judgment, there was no possibility that the appellate court would modify the judgment such that the wife would receive less than what the trial court awarded her. *Id.*

¶ 158 Respondent does not question *Kusper*'s holding. Subsequent to filing his motion to dismiss, respondent abandoned his cross-appeal by failing to file a cross-appellant's brief.

Consequently, under *Kusper*, the release of errors doctrine is inapplicable here, and we deny respondent's motion to dismiss.

¶ 159                    B. Claims for Breach of Contract and Breach of Fiduciary Duty

¶ 160    Petitioner argues that the trial court erred by refusing to consider her claims that respondent breached contractual and fiduciary duties to her.

¶ 161    Petitioner's claims based on a violation of fiduciary duty are raised for the first time on appeal. [9] Consequently, the claims are forfeited.  See *In re Estate of Chaney*, 2013 IL App (3d) 120565, ¶ 8 ("It is well-settled law in Illinois that issues, theories, or arguments not raised in the trial court are forfeited and may not be raised for the first time on appeal.").

¶ 162    Petitioner referenced her breach of contract claims throughout the evidentiary portion of the trial but did not fully articulate them until her written closing argument.  She argued that respondent breached the PNA by depriving her of nonmarital property, namely (a) income shown in the income allocation statements; and (b) proceeds from the sale of intellectual property from "ICMC, LLC *** to Rising Tide."  Petitioner also claimed that her interest in CASJS was not validly removed and that, between 2013 and 2014, IC & MC, LLC (formerly named CASJS), improperly disbursed funds in which petitioner had an interest.

---

[9]  In her opening brief, petitioner remarks that "[t]he trial court noted that [petitioner's] *** claims *** were in the nature of a breach of fiduciary duty."  The court, however, was speaking of petitioner's attempt to prove that respondent acted improperly by removing her as a beneficiary of a trust, which is different conduct than that which underlies petitioner's fiduciary duty claims as presented on appeal.

¶ 163   During the evidentiary portion of the trial, the court was skeptical that the claims were appropriate for resolution within the dissolution proceeding because petitioner appeared to be seeking relief from third party entities that were not part of the proceeding.  The court did not mention the claims in the dissolution judgment.  We presume that the court ultimately concluded, as it had suggested repeatedly, that the claims exceeded the scope of the dissolution proceeding. We may affirm the trial court's judgment on any basis appearing in the record.  *Knott v. Woodstock Farm & Fleet, Inc.,* 2017 IL App (2d) 160329, ¶ 32.

¶ 164   We address first the claims concerning the income attributed to petitioner in the income allocation statements and the proceeds from the sale of intellectual property.  Petitioner did not present these claims as separate causes of action, as both parties on appeal seem to suggest. Petitioner asked that certain property be deemed her nonmarital property pursuant to the PNA, but she did not seek a separate award of damages.

¶ 165   We hold that, regardless of whether (as the trial court found) necessary parties were absent from the dissolution action, petitioner has not established that the assets in question were her nonmarital property under the PNA.  The PNA defines, as the nonmarital property of a party, "all property of every kind and character and wherever located which [the party] owned or had an interest in *príor to [the] marriage*," including "all interest, dividends, rents, income, gains and profits which may in time be generated by or realized from such property."  (Emphasis added.) A party's nonmarital property also includes any property acquired by the party during the marriage "by reason of [the party's] own separate funds, income or assets."  Petitioner points to nothing in the record to suggest that she acquired the property in question before the marriage *or* acquired it with property that she held before the marriage.  On our review of the record, petitioner held no interests in Stephenson entities before the marriage, and the interests she acquired during

the marriage were not obtained through her separate property but were gifts from respondent. Petitioner cites the attribution of "income" to her in the allocation statements, but she does not explain how we are to reconcile the concept of "income" in the allocation statements with the narrow concept of a nonmarital asset provided in the PNA.

¶ 166    We note that petitioner traces some of the property in question to Stephenson entities that were listed in the trial stipulation. In its dissolution judgment, the trial court determined that petitioner's interests in the stipulation entities were her nonmarital property. Petitioner suggests that, *a fortiori*, by virtue of the PNA, she is entitled to all income from the stipulation entities. She fails, however, to recognize the basis on which the trial court determined that her interests in the stipulation entities were her nonmarital property. The court did not classify petitioner's interests in the stipulation entities as nonmarital because they met the definition of nonmarital property in the PNA. As noted, those interests clearly did not meet that definition. Rather, the trial court determined that the interests were nonmarital because they constituted gifts from respondent according to Illinois law. According to the court, respondent's divestiture of his interests in the stipulation entities went "beyond the terms of [the PNA] that would otherwise require revestment of [petitioner's] interests to [respondent]." Thus, Illinois law, not the PNA, determined if income from the stipulated interests was petitioner's nonmarital property. Under section 503(a)(8) of the Act (750 ILCS 5/503(a)(8) (West 2016)), income from nonmarital property is itself nonmarital if it is not attributable to the personal effort of a spouse. Petitioner makes no attempt to apply the standards of section 503(a)(8) to income from the stipulation entities. As petitioner has not established that income listed in the allocation statements or the proceeds of the intellectual property sale were her nonmarital property, we uphold the trial court's rejection of those two claims.

¶ 167    As for CASJS, we note that petitioner did not assert below that her interest in that entity was her nonmarital property.  Rather, she appeared to claim that that the CASJS operating agreement granted her a contractual right independent of the PNA.  In our view, the trial court would have had no authority in the dissolution proceeding to adjudicate a freestanding claim for breach of contract.  The trial court in a dissolution proceeding has subject matter jurisdiction over all justiciable matters (*In re Marriage of Baniak*, 2011 IL App (1st) 092017, ¶ 15) and "does not exceed its jurisdiction merely because it overlooks or misapplies the provisions of the [Act]" (*In re Marriage of David*, 367 Ill. App. 3d 908, 916 (2006)).  Subject matter jurisdiction, however, is distinct from authority.  See *McCormick v. Robertson*, 2015 IL 118230, ¶¶ 19, 22.  "The authority of a circuit court to act in dissolution of marriage cases is conferred only by statute."  *In re Marriage of Rhodes*, 326 Ill. App. 3d 386, 388 (2001).  "The Marriage Act confers only limited authority to make orders touching property division, maintenance of the parties, and the custody, care, and support of the parties' children."  *Id.*  See *In re Marriage of Foran*, 225 Ill. App. 3d 756, 758-59 (1992) (spouse's claim that the other committed a tort by infecting him with a sexually transmitted disease exceeded the scope of the dissolution action, as the claim would have required the court "to conduct a separate trial within the dissolution proceeding to decide the issue *** and determine the amount of damages, if any, owed").

¶ 168    On appeal, petitioner relies not only on the CASJS operating agreement but also asserts that her interest in CASJS was her nonmarital property under the PNA.  Her assertion based on the PNA is forfeited on two grounds.  First, she did not raise it below.  See *Chaney*, 2013 IL App (3d) 120565, ¶ 8.  Second, she does not support the assertion with argument.  See Ill. S. Ct. R. 341(h)(7) (eff. May 18, 2018) (points without supporting argument are forfeited).  In any case, it is doubtful that petitioner's interest in CASJS was her nonmarital property under the PNA since

CASJS was formed during the marriage and petitioner's interest in that entity does not appear traceable to interests that petitioner held before the marriage.

¶ 169                                    C. Discovery

¶ 170    Petitioner argues that the trial court "abused its discretion in quashing discovery related to Cornell Williams, the individual signatory to the second operating agreement of [IC & MC, LLC],[10] and by its rulings precluding [petitioner] from further proving her breach claims."

¶ 171    We address first petitioner's complaints about the court's pretrial conduct of discovery. She points to the trial court's order of November 28, 2011, requiring leave of court for any further subpoenas.  She claims that "requiring [her] to divulge trial strategy in order to complete discovery requests seems inherently wrong on its face."  However, she fails to show how she was prejudiced by the limitation that the court imposed.  She also complains that the trial court reserved its ruling on her request to take Williams' deposition, and that this "resulted in yet another hearing on the issue."  Petitioner, however, does not share what, if any, reasons the trial court gave for reserving its ruling.  Nor does she report the result of the subsequent hearing on the issue.  Thus, petitioner has not developed her complaints into actual contentions of error.  In fact, her points lack not only argumentation but also pertinent authority, as she cites no substantive standard relating to discovery.  Accordingly, we find that petitioner has forfeited her points relating to pretrial discovery.  See Ill. S. Ct. R. 341(h)(7) (eff. May 18, 2018).

¶ 172    Second, petitioner argues that the court erred when, at trial, it granted respondent's motion to quash her subpoena to Williams under Supreme Court Rule 237(b) (eff. July 1, 2005).  Rule

_____

[10] Actually, this was the operating agreement for CASJS, which was later renamed IC & MC, LLC.

237(b) states that "[t]he appearance at the trial or other evidentiary hearing of a party or a person who at the time of trial or other evidentiary hearing is an officer, director, or employee of a party may be required by serving the party with a notice designating the person who is required to appear." Petitioner argues, as she did below, that an employment relationship between respondent and Williams was not necessary for application of Rule 237(b):

"To say that Mr. Williams is not [respondent's] employee is semantics, at best. It cannot be disputed that [respondent], a/k/a the 'chairman,' is in total control of ICMC, LLLP, which Williams is a signatory officer of. That ICMC, LLLP, is not [respondent] personally, but a limited liability limited partnership, allegedly created for tax reasons, does not change the fact that Mr. Williams works for [respondent]. Nor can it be disputed that Mr. Williams is the signatory to the second and subsequent 'operating agreement' and that hundreds of millions of dollars in dividend payments were diverted from International Capital & Management Company, LLC, which [petitioner] owns half of."

¶ 173 Thus, petitioner argues that Williams was subject to a Rule 237(b) subpoena because he was the officer of an entity over which respondent had ultimate control. The record reflects that Williams was an officer of IC & MC, LLC, and its 100% owner, ICMC, LLLP. The RJS Trust (of which respondent was co-trustee) held an 80% interest in ICMC, LLC, which in turn held a 1% general partner interest in ICMC, LLLP.

¶ 174 Petitioner does not support her reading of Rule 237(b) with any textual analysis or case law providing such analysis. We agree with the court in *White v. Garlock Sealing Technologies, LLC*, 398 Ill. App. 3d 610, 621 (2010), that, if the supreme court had intended control to be the overriding criterion for application of Rule 237(b), the court would have "use[d] the term 'agent' or the phrase 'a person under a party's control'" rather than the terms "officer, director, or

employee." We hold that Rule 237(b) did not apply to Williams because he was not respondent's employee at the time of trial.

¶ 175                                    D. Maintenance

¶ 176                                   1. Governing Law

¶ 177    Petitioner argues that the trial court erred in awarding her maintenance of $55,000 per month because that amount "does not allow her to even approach the lifestyle of the marriage."

¶ 178    Illinois law permits parties to enter into premarital agreements that govern spousal maintenance. See 750 ILCS 10/11 (West 2016) (the Illinois Uniform Premarital Agreement Act, applicable to agreements executed on or after January 1, 1990). The parties' September 1991 PNA has provisions on maintenance, and its validity is not questioned in this appeal.

¶ 179    In the PNA, respondent waives any claim to maintenance. As for petitioner, the PNA provides that, if either party initiates a proceeding for separation or divorce after seven years from the date of the marriage, then the amount and duration of petitioner's maintenance "shall be determined by negotiation of the parties or, failing same, by any court of competent jurisdiction."

¶ 180    Section 504(a) of the Act lists 14 factors that the trial court must apply in determining whether an award of maintenance is appropriate in the first instance. Those factors are:

> "(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;
>
> (2) the needs of each party;
>
> (3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2016).

¶ 181 If the court determines that an award of maintenance is appropriate, the court proceeds to determine the amount and duration of maintenance. If certain conditions are met, one of which is that the parties' combined gross income is less than $250,000, then the amount and duration of

maintenance is determined according to guidelines which are specified in section 504(b-1) (750 ILCS 5/504(b-1)(1) (West 2016)). The guidelines do not apply in any case in which the court "makes a finding that the application of the guidelines would be inappropriate." *Id.* If the case does not qualify for the guidelines, or if the court makes a finding that the guidelines are not appropriate for the case, then the court returns to section 504(a) to determine the amount and duration of maintenance according to the factors specified therein. 750 ILCS 5/504(b-1)(2) (West 2016).

¶ 182   Here, the trial court applied the factors in section 504(a) and determined that an award of maintenance was appropriate. As to the amount and duration of maintenance, the guidelines were inapplicable because the combined gross income of the parties exceeded $250,000. Therefore, the trial court applied the factors in section 504(a). The court found that nearly all factors under section 504(a) weighed in favor of petitioner. Of the remaining factors, the court found that two were neutral and that one weighed in favor of respondent. The court decided upon an award of $55,000 per month in permanent maintenance, to continue until the termination conditions specified in the PNA were met.

¶ 183   Given the duration of the marriage, the PNA generally left the determination of maintenance in this case to section 504 and the case law interpreting it. Nonetheless, the PNA does provide some particular guidance on maintenance. In what follows, we set forth the pertinent law on maintenance as well as the relevant provisions of the PNA.

¶ 184   No single factor is dispositive under section 504(a) in setting the amount and duration of maintenance. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 119. Maintenance awards are within a trial court's sound discretion, and a reviewing court will not disturb an award absent an abuse of that discretion. *In re Marriage of Brunke*, 2019 IL App (2d) 190201, ¶ 32. An abuse

of discretion occurs only where no reasonable person would take the view adopted by the trial court. *Id.* The party challenging the maintenance award bears the burden of showing an abuse of discretion. *Id.*

¶ 185 In broad terms, maintenance is a function of the one spouse's reasonable needs and the other spouse's ability to pay. See *In re Marriage of Werries*, 247 Ill. App. 3d 639, 651 (1993). The reasonable needs of the requesting spouse are determined according to several factors such as: the standard of living established during the marriage; the duration of the marriage; the requesting spouse's ability to become self-sufficient; and the value, and income-producing potential, of the requesting spouse's marital and nonmarital property. *In re Marriage of Selinger*, 351 Ill. App. 3d 611, 615 (2004). Division of property is the primary means under the Act of providing for the financial needs of the parties. *Brunke*, 2019 IL App (2d) 190201, ¶ 39. A spouse may be awarded both property and maintenance, but "[m]aintenance may be awarded only if the recipient spouse lacks sufficient property, including marital property apportioned to him or her in the divorce, to provide for his or her reasonable needs, is unable to support him or herself through appropriate employment, or is otherwise without sufficient income." *Id.* At the same time, "[a] spouse seeking maintenance should not be required to sell assets or impair capital to maintain herself in a manner commensurate with the standard of living established in the marriage as long as the payor spouse has sufficient assets to meet both his needs and the needs of his former spouse." *In re Marriage of Drury*, 317 Ill. App. 3d 201, 207 (2000).

¶ 186 As to the factor of marital lifestyle:

"[The dependent former spouse is entitled to continue to live in some approximation to the standard of living established during the marriage unless the payor spouse's financial situation, the duration of the marriage, or other factors indicate otherwise. [Citation.] The

optimal goal of the maintenance act is for the dependent former spouse to become financially independent. However, under circumstances involving former spouses with grossly disparate earning potentials, this goal is often not achievable in light of the dependent former spouse's entitlement to maintain the standard of living established during the marriage. Hence, the goal of financial independence must be balanced against a realistic appraisal of the likelihood the spouse will be able to support herself in some reasonable approximation of the standard of living established during the marriage." *In re Marriage of Lenkner*, 241 Ill. App. 3d 15, 25 (1993).

¶ 187   " 'Rehabilitative maintenance is appropriate if the evidence shows a potential for future employability at an income that allows approximately the same standard of living established during the marriage.' " *In re Marriage of Heasley*, 2014 IL App (2d) 130937, ¶ 23 (quoting *Brackett*, 309 Ill. App. 3d at 340). Permanent maintenance, on the other hand, is appropriate where a spouse "is either unemployable or employable only at an income that is substantially lower than the previous standard of living." *In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶ 28. A spouse's earning capacity can become diminished when the demands of marriage prevent the spouse from developing skills or a career. *In re Marriage of Pearson*, 236 Ill. App. 3d 337, 347-48 (1992). " '[P]ermanent' does not mean everlasting; it means the obligation is for an indefinite period." *In re Marriage of Wojcik*, 2018 IL App (1st) 170625, ¶ 30. Absent the express agreement of the parties, any award of maintenance is modifiable on the grounds sets forth in 510(a-1) of the Act (750 ILCS 5/510(a-1) (West 2016)). One ground for modification is that the recipient spouse failed to make good-faith efforts to become financially independent. *In re Marriage of Samardzija*, 365 Ill. App. 3d 702, 708 (2006).

¶ 188   The PNA has the following provisions that pertain to the setting of maintenance: (1) petitioner "shall have the primary responsibility for her individual maintenance and support"; (2) respondent shall provide petitioner with all funds to purchase a home with a price not to exceed $250,000 as of 1991 (or $450,000 as of 2017); and (3) respondent shall pay for petitioner to obtain an undergraduate degree at the institution of her choice.  We return to these provisions in our discussion to follow.

¶ 189   Petitioner challenges the trial court's findings in three major areas: (1) the parties' lifestyle during the marriage; (2) the disparity between the parties' income and property; and (3) petitioner's efforts to improve her earning capacity.

¶ 190   We begin with an overview of petitioner's claimed needs as compared to the financial resources she has in the wake of the dissolution.  According to Belmonte Newman, petitioner needs $433,991 per month to sustain the lifestyle she enjoyed during the marriage.  In the dissolution judgment, petitioner was awarded the following property:

> (1) $6,519,282, the buyout amount for petitioner's interests in the Stephenson entities listed in the trial stipulation;
>
> (2) $473,942, the balance of petitioner's investment account at Alliance Bernstein;
>
> (3) $30,000, the balance of petitioner's bank account;
>
> (4) $30,000, the balance of petitioner's 401(k) account; and
>
> (5) $4,054,127, the value of the jewelry.

The total value of the property was $11,107,351.  Apparently, the account balances were all that remained in liquid assets of the $65,000 per month in interim support that petitioner had received since December 2009, for a total of approximately $6 million.

¶ 191   The trial court ruled that, in addition to the property award, petitioner was entitled to funds from respondent for the purchase of a home with a price not to exceed $250,000 as of 1991 (or $450,000 as of 2017) and to funds for a four-year undergraduate degree at the institution of petitioner's choice.  Furthermore, the trial court awarded permanent maintenance of $55,000 per month, or $660,000 per year.

¶ 192   The court noted the income-earning potential of the property award.  Gonzalez, petitioner's financial adviser, projected that petitioner would earn a median rate of 6.9% percent per annum on funds invested with him.  Petitioner claims that, to receive the benefit of that return, she will be "effectively require[d] *** to invest every dollar received."  Petitioner will not have to invest every dollar, but she will have to be disciplined.  At the projected rate of return, the $6.5 million will generate interest $423,753 *in the first year alone*.  With the benefit of compounded returns, petitioner will be able to draw hundreds of thousands from the account each year without invading principal.  Through maintenance and *investment income alone*, petitioner stands to receive in excess of $1 million annually (before taxes).  Such resources can support a lifestyle that few, the world over, would not envy.  We recognize, of course, that what governs the appropriateness of the maintenance award are not wealth percentiles or popular opinion but section 504(a) and the PNA.

¶ 193   In our analysis to follow, we focus on the section 504(a) factors that are the most consequential here.  We begin with tax issues, which the trial court addressed under factors (11) (tax consequences) and (14) (catchall for other relevant factors) of section 504(a).  As the trial court noted, petitioner will not be taxed on the property award of $6.5 million.  The court seemed most concerned with petitioner's tax liability stemming from trust income.  In our view, this concern was misplaced.  The court believed that petitioner would be responsible for tax on income

earned by her as the grantor of the Alicia L. Stephenson Irrevocable Trust (ALSI Trust), which the court stated was "created by petitioner using a $1,000,000 gift from [respondent]." The court apparently was thinking of a different trust. The ALSI Trust was created in 1998. There is no mention in the record of this trust being funded with $1 million. In fact, the only asset of the ALSI Trust identified in the record is a life insurance policy. The court might have been referring to the SD Trust, which was created in 2003 as part of a comprehensive estate plan and was funded with a $1 million gift from respondent to petitioner. The $1 million was then used to purchase interests in Stephenson entities. Initially, as grantor of the SD Trust, petitioner was personally liable for the taxes on the trust's income. According to Harris, assets were subsequently transferred out of the SD Trust, relieving petitioner of that tax liability. Thus, contrary to the trial court's assertion, the record does not show that petitioner has any prospective tax liability for trust income. Nor does petitioner claim on appeal that she has any such liability. Instead, petitioner notes that, from 2009 onward, she paid $251,000 in tax on K-1 income attributable to her interests in Stephenson entities, despite not receiving any income from those entities during that time. Of course, that liability will cease once petitioner, per the dissolution judgment, transfers those interests to respondent.

¶ 194　We move to factors (1) (income) and (3) (earning capacity), both of which the trial court found favored petitioner. As to factor (1), the court found that, even with the $6.5 million buyout for her interests in the Stephenson entities, petitioner's income and property "pales in comparison to [respondent's] non-marital wealth." As for factor (3), the court found that respondent's present and future earning capacity was "substantial," while petitioner's capacity was "limited in comparison."

¶ 195 Petitioner suggests that the court's findings on factors (1) and (3) are a "gross understatement" of the disparity in wealth between the parties. She suggests that the wealth gap in this case "is on par [with], if not higher, than any dissolution proceeding to ever come before this Court." We presume that the court appreciated the full significance of the financial figures it received in evidence even if it did not describe the wealth differential as dramatically as petitioner would have liked. The Stephenson entities in which respondent has controlling interests have an aggregate value in the billions. Between 2012 and 2015 alone, respondent reported total individual income of over $49 million on his federal tax returns. His counsel stipulated that he could afford to pay monthly maintenance of $400,000 after taxes, and the record more than confirms that capability. Even with generous investment projections, petitioner's wealth will be a fraction of respondent's.

¶ 196 However, maintenance is not designed to close wealth gaps *per se*, and an award of maintenance is not appropriate just because the payor spouse can afford it to pay it. See, *e.g.*, *Bratcher*, 383 Ill. App. 3d at 392 ("The fact that David could afford to pay some maintenance is not a reason for ordering him to do so"). The financial condition of the payor spouse is but one factor in determining the amount of maintenance, and no factor is dispositive. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 651 (2008).

¶ 197 The court also found that factor (12) (contribution to the other spouse's career) favored petitioner because her work for various Stephenson entities, including Gateway, "helped [respondent's] enterprises grow and become more valuable."

¶ 198 Also favoring petitioner, the court found, was factor (4) (impairment of earning capacity):

"The [PNA] contemplates [petitioner] would not be gainfully employed during the marriage. Except for her position as chair of Gateway Foundation, she was not employed.

[Petitioner's] devotion to raising Shelby and her devotion to [respondent] and the family businesses contributed to [respondent's] success. There was no time for a separate career for [petitioner] although her work with Gateway provided valuable experience."

¶ 199   The court, however, faulted petitioner for not seeking to further her education *after* the parties separated in 2009. Thus, the court found that factor (6) (opportunity to acquire further education) weighed against petitioner:

"The parties have been separated since 2009 and [petitioner] has made little effort to continue her education even though she is entitled to pursue a four year degree at [respondent's] expense. (See [PNA], section 4.4 (g)). [Petitioner] has been receiving $65,000 per month in temporary support during most of this period. [She] has had time and opportunity to seek employment, education or training to become more self-reliant. [Petitioner] testified she was waiting to see where she would settle. Regardless, the court finds [petitioner] had the opportunity to begin acquiring appropriate training and education for further employment possibilities based on the resources available to her and failed to do so."

To clarify, petitioner began receiving temporary support of $65,000 per month in June 2011, retroactive to December 2009.

¶ 200   Petitioner submits that it is "almost laughable" for her to pursue a college degree in her mid-50s. The trial court, however, was referencing the time between the parties' separation and trial. Petitioner was in her 50s at the start of trial (2016), but she was in her 40s when the parties separated (2009). Petitioner goes on:

"What effect, if any, a newly obtained degree would have for a woman of advancing years and no professional history outside of [respondent's] empire is unclear. Most certainly, it

would not materially change her earning capacity or put her on equal footing with [respondent's] abilities and experience."

¶ 201 Petitioner then compares the court's findings on factor (6) with its findings on factor (7) (marital lifestyle), which were as follows:

"The standard of living established during the marriage favors an award to [petitioner]. The court recognizes that if [petitioner] was employed earning a salary similar to the approximate $100,000 per year she earned at Gateway, she could not approach the lavish lifestyle she enjoyed while married to [respondent]."

¶ 202 Petitioner asks how the court could, consistently, regard her failure to pursue a college degree as a material factor while also recognizing that even a substantial salary, $100,000, would not approach the parties' standard of living during the marriage. The answer lies in the duty that petitioner freely undertook in signing the PNA, article 4 of which provided:

"The parties recognize that if [*sic*] in the event of [a proceeding for separation or divorce], [petitioner] shall have the primary responsibility for her individual maintenance and support. Accordingly, [petitioner] agrees that she shall use her best efforts in light of her then station in life, and health, to begin or complete her undergraduate and/or post graduate education and training in order to obtaín employment and otherwise pursue a gainful occupation, *and* to use her property to generate income for her support and maintenance." (Emphasis added.)

¶ 203 We recognize that, immediately after setting forth this duty of self-sufficiency, the PNA states that, "[n]otwithstanding the foregoing," petitioner would receive maintenance as provided in the paragraphs to follow. We construe a premarital agreement according to the principles of contract interpretation. *In re Marriage of Woodrum*, 2018 IL App (3d) 170369, ¶ 108. The

primary purpose of construing a contract is to give effect to the intent of the parties, the best indicator of which is the contract language given its plain and ordinary meaning. *Id.* In interpreting a contract, we presume that each provision was inserted for a purpose and was not intended to be superfluous or nullified by other provisions. *Atwood v. St. Paul Fire & Marine Insurance Co.*, 363 Ill. App. 3d 861, 864 (2006)). The trial court was correct that the foregoing language requiring petitioner's best efforts to become self-sufficient cannot be construed as a condition precedent to her obtaining maintenance. The court nonetheless, however, attributed weight to the language. Specifically, the court found that petitioner's opportunity to obtain substantial gains though investment of the $6.5 million in buyout proceeds "satisfie[d]" her duty under the PNA to support herself.

¶ 204 However, to the extent that the court was suggesting that investment of property was all the effort that the PNA obligated petitioner to make toward self-sufficiency, the court was mistaken. The language about investment was linked to the remainder of the passage by "and," indicating a duty that was *in addition* to the duty to pursue further education "in order to obtaín employment and otherwise pursue a gainful occupation." See *Chicago Land Clearance Comm'n v. Jones*, 13 Ill. App. 2d 554, 559 (1957) ("Ordinarily the word 'and' and the word 'or' are not in any sense interchangeable terms. 'And' is strictly of a conjunctive, 'or' of a disjunctive, nature."). To give full effect to the agreement of the parties, we accord appropriate weight to the fact that, during the several years of separation, petitioner neither took advantage of her opportunity to pursue a college degree at respondent's expense nor obtained gainful employment.

¶ 205 We note that, despite the substantial property awarded petitioner, the court believed that an award of maintenance was necessary for her to enjoy a reasonable approximation of the marital lifestyle. On factor (7), concerning the marital lifestyle, the trial court found:

"The evidence at trial convinces the court the parties enjoyed a very lavish lifestyle during the marriage. [Petitioner] called Kathy Belmonte Neuman [*sic*] to present a lifestyle analysis. Neuman testified to future costs for [petitioner] based on certain assumptions. [Petitioner's] theory, presented through Neuman [*sic*], is [respondent] should compensate [petitioner] to the extent that [petitioner] can acquire real estate, cars, boats, motorcycles and other personalty to approximate [respondent's] possessions which she had access to during the marriage. There was testimony about private use of planes, yachts and various vacation homes. Many witnesses testified about lavish parties at Tudor Oaks and off-site venues. The parties had access to season tickets at Soldier Field [and] the United Center and travelled to the Rose Bowl and several Super Bowls. [Petitioner, respondent] and their daughter Shelby travelled the world with a tutor for Shelby. Private security was used at times on trips and first-class accommodations were always in order. [Petitioner] testified most trips, and use of private jets in particular, were personal in nature and unrelated to business. [Respondent] testified the majority of travel and entertainment was business related. Many trips to events such as Super Bowls, Sturgis rallies, concerts etcetera, included business associates. But it is clear to the Court the business associates were also social friends. The evidence suggests that [respondent and petitioner] combined business with pleasure whenever possible. Money for expenses was never an issue and the funds were provided by [respondent] through his business empire.

Whether it be shopping, travel by private jet, purchase of cars or redecorating, [petitioner] was provided adequate funds. The parties certainly enjoyed the lifestyle of the rich and famous. The court factors in the lifestyle enjoyed during the marriage but the court finds it unnecessary for [respondent] to fund purchases described by Belmonte

Neuman [*sic*] for [petitioner] to enjoy a similar lifestyle. [Petitioner] can access opulent

accommodations without the added expense of ownership."

¶ 206   We address first petitioner's contention that the trial court "rewarded" respondent for

failing to counter Belmonte Newman's lifestyle analysis with his own expert witness. According

to petitioner, the court "took an arbitrary 'solomonic' approach, siding on the absence of evidence

over the evidence presented." Petitioner cites *In re Marriage of Glusek*, 168 Ill. App. 3d 987, 993

(1988), for the proposition that "[a] party should not be able to benefit on review from his failure

to introduce evidence at trial." In *Glusek*, the respondent husband appealed the dissolution

judgment. He argued, among other points, that the trial court overvalued his welding business.

He testified at trial as to the price he paid for the business and the price he sold it for six years

later. He produced no other evidence pertinent to the valuation of the business. The appellate

court commented that it was the respondent's "obligation to present the court with sufficient

evidence of the value of the property," and that he presented no "solid evidence" on that issue.

*Id.* Accordingly, the court held that the respondent was estopped from the challenging the trial

court's valuation. *Id.*

¶ 207   *Glusek* is part of a line of cases recognizing that a party appealing a dissolution judgment

may be estopped from challenging the valuation of an asset. In *In re Marriage of Abu-Hashim*,

2014 IL App (1st) 122997, ¶ 29, the court drew the following principles from that line of cases:

"To place a specific value on an item of marital property, there must be competent

evidence of its value presented. [Citation.] Generally, the valuation of assets in an action

for dissolution of marriage is a question of fact, and the trial court's determination will not

be disturbed absent an abuse of discretion. [Citation.] But where a party does not offer

evidence of an asset's value, the party cannot complain as to the disposition of that asset

by the court. [Citation.] Parties should not be allowed to benefit on review from their failure to introduce evidence at trial. [Citation.]"

As in *Glusek*, the respondent husband in *Abu-Hashim* appealed the dissolution judgment, challenging the trial court's valuation of a business. Applying the estoppel rule, the court declined to disturb the valuation "[b]ecause neither party presented meaningful evidence" on the issue. *Id.* ¶ 31.

¶ 208 Unlike the parties in *Abu-Hashim* and *Glusek* against whom the estoppel rule was applied, respondent has not appealed the maintenance award. Petitioner, not respondent, is the party on appeal who is "complain[ing]" about the award of maintenance and seeking the "benefit" of a modification of the award. The apparent point of the estoppel rule is to bar a party from upsetting the trial court's ruling on an issue of fact as to which that party provided no evidence. Thus, it is a rule that defends the trial court's judgment. Petitioner, however, would wield the rule as a weapon to upset the trial court's judgment, but she cites no authority to support such use. Therefore, we reject petitioner's contention that respondent is barred from defending the trial court's judgment by challenging Belmonte Newman's lifestyle analysis.

¶ 209 Moving to petitioner's other challenges, we first comment about the nature of the evidence as to the marital lifestyle. During pretrial proceedings, the parties produced financial affidavits pursuant to Rule 11.02 of the 22nd Judicial Circuit (eff. July 1, 2005). When she prepared her lifestyle analysis, Belmonte Newman relied heavily on respondent's June 2016 financial affidavit as evidence of the marital lifestyle. She presumed that the parties' monthly living expenses during the marriage were at least as great as respondent's estimates of his monthly living expenses ($318,636) as of June 2016. Belmonte Newman believed, however, that respondent's monthly living expenses were understated because he did not include expenses in certain categories and

did not acknowledge expenses paid by Stephenson entities. However, neither in her report nor in her testimony did Belmonte Newman identify which expenses were paid by the Stephenson entities.

¶ 210    Notably, in its findings, the only source that the trial court cited for the parties' lifestyle was their testimony; the court did not reference respondent's June 2016 affidavit. Perhaps the court felt it peculiar, as do we, that Belmonte Newman used respondent's post-divorce *2016* affidavit as representative of the parties' living expenses from *2004 to 2007*, which was the relevant time period that the parties agreed on for assessing the marital lifestyle. Presumably, Belmonte Newman felt such reliance compelled because of what she claimed was a lack of historical evidence of the parties' spending, such as bank records and credit card statements. This only begs the question of why she did not choose financial affidavits that were generated closer in time to the filing of the dissolution petition and, hence, closer in time to the marriage. Petitioner suggests on appeal that the lack of historical data for the parties' marital lifestyle was due to respondent's "obstinance in discovery." Petitioner, however, develops no argument challenging the trial court's rulings on discovery that pertained to the marital lifestyle. Hence, in her challenge to the maintenance award, petitioner bears the consequences of flaws in Belmonte Newman's analysis.

¶ 211   The trial court awarded petitioner about 13% percent of the maintenance she requested ($55,000 per month versus $433,000 per month). The only reason the court provided for awarding such a vastly lower amount was that petitioner could enjoy a lifestyle similar to the marital lifestyle without having to make all of the "purchases" that Belmonte Newman budgeted for. However, even after deducting all major purchases that Belmonte Newman contemplated (*i.e.*, the household and transportation expenses totaling $181,677 per month and including purchases

of two homes and multiple cars, motorcycles, and watercraft), the maintenance award was still less than 25% of what petitioner sought. The court evidently believed that Belmonte Newman's expense projections were inflated not just because she allowed for too many "purchases." Notably, for several expense categories, Belmonte Newman relied on petitioner's recollection of what the parties spent during the marriage. Petitioner's credibility thus became an issue, and the trial court was in a far better position to judge credibility since he observed the witnesses' demeanor as they testified. See *In re Marriage of McHenry*, 292 Ill. App. 3d 634, 641 (1997).

¶ 212   In our view, there were several projected expenses that the trial court could have justifiably discounted because of insufficient support. We begin with Belmonte Newman's projection for housing expenses, which allowed for the purchase of two homes and the rental of a third. Respondent contends that the PNA controls on the issue of housing and limits petitioner to the home that article 3 of the PNA requires respondent to purchase for petitioner (maximum purchase price of $450,000 as of 2017). Thus, according to respondent, maintenance awarded under article 4 may not include additional amounts for housing. Petitioner disagrees, asserting that the obligation imposed by article 3 is independent of any allowance for housing included in a maintenance award under article 4. We agree with petitioner.

¶ 213   Article 3 provides that Tudor Oaks, the primary marital residence, is respondent's nonmarital property and that petitioner will vacate the premises not more than 120 days after an action for separation or divorce is filed. Article 4 states that, if the parties have been married more than seven years before an action for separation or marriage is filed, maintenance "shall be determined by negotiation of the parties, or failing same, by any court of competent jurisdiction."

¶ 214   There is no suggestion in articles 3 or 4 that respondent cannot be required under article 4 to provide amounts for housing beyond what is mandated in article 3. The article 3 home is best

viewed as a "safety net"—the minimum housing support required of respondent in view of the fact that petitioner will have to vacate Tudor Oaks. If warranted by the marital lifestyle, petitioner may be awarded additional amounts for housing under article 4.

¶ 215    Belmonte Newman recommended $165,123 per month for housing expenses, which included: (1) two homes (Chicago and Florida); (2) a summer rental (Michigan); (3) a staff of three; and (4) renovations, furniture, and decorations for the Chicago and Florida homes as well as for the Wynstone home that respondent purchased during the separation.

¶ 216    Addressing the article 3 allowance for housing, the trial court said:

> "Absent other factors the court could consider a modest monthly maintenance award for [petitioner] to in this type of residence. However, there are other factors for the court to consider."

¶ 217    The court seemed to be suggesting that it would include additional amounts for housing in its maintenance award. How much additional is not clear, but we note that the entire maintenance award was one-third of what Belmonte Newman recommended *for housing alone*.

¶ 218    We can identify areas where the trial court could have justifiably discounted Belmonte Newman's allowance for housing. She budgeted for the purchase of a second home in Florida ($30,344 per month in mortgage, property taxes, and assessments) as an analogue to the USVI home. Petitioner testified that the parties spent nearly every spring break in Florida or at the USVI home and that they stayed two to four weeks at a time at the USVI home. The court would have been warranted in finding that the parties did not use the USVI home so frequently that a suitably "opulent" Florida rental would not suffice for petitioner. Of course, excluded together with the purchase of a Florida home would be the furniture expenses ($16,127 per month, amortized) that Belmonte Newman budgeted for such a home. We also note that, since petitioner

did not currently own the Wynstone home and the trial court did not award it to her in the judgment, the court must have also excluded the $21,540 per month (amortized) that Belmonte Newman budgeted for furniture for the Wynstone home.

¶ 219   Surpassing even the amount that Belmonte Newman allocated for mortgage and rent was a striking $104,147 per month for vacations.  The figure includes four trips per year between Chicago and the Michigan rental and seven trips per year between Chicago and the Florida home—all by private plane.  Belmonte Newman also allowed for other domestic vacations to various destinations and one vacation to Mexico.  While the parties certainly could afford to spend $1.2 million per year on vacations, there was nothing in Belmonte Newman's report, or the record, to suggest that their vacation expenditures even approached that number.  Usage of the Leland and USVI homes was rather modest, and petitioner did not testify to any regular vacations aside from yearly trips to the Super Bowl and the motorcycle rally at Sturgis.  Interestingly, vacation on such a scale as Belmonte Newman calculated as part of the marital lifestyle would seem to have conflicted with the parties' work lives, which petitioner complained were too busy.   We agree with respondent that Belmonte Newman's list of vacation destinations for petitioner was a "wish list" that lacked historical precedent.

¶ 220   There was also inadequate historical support for the fourth-largest allocation (after $104,147 for vacations, $75,307 for mortgage/rent, and $53,351 for furniture): $30,123 per month for clothing.[11]  Belmonte Newman admitted that she had no financial records to support this

_____

[11] Remarkably, the clothing allotment was $100 greater than the entire monthly amount budgeted for care of Valentine, which included her personal expenses, health insurance, medical expenses, caregiver expenses, and household expenses (including mortgage).

figure. She relied on petitioner's possession of expensive furs during the marriage and her estimate that she spent $250,000 per year, or $20,833 per month, on clothing. Petitioner, however, admitted at trial that she was uncertain if she would even need $10,000 per month for clothing.

¶ 221 Also of concern was the $26,373 per month that Belmonte Newman allocated for local entertainment, dining out, and hobbies. Belmonte Newman's allocation for entertainment ($18,984 per month) consisted of a 20-ticket suite for each of the Bears' 10 home games, four tickets ($500 each) for an additional 8 concerts or sporting events, and meals and limousine service for each event. Petitioner testified that the parties were loyal Bears fans and that CTCA owned Bears season tickets and a box at the United Center. She also claimed that the parties enjoyed attending concerts and Broadway shows. Petitioner did not, however, state how frequently the parties attended events or shows, how many companions they took, or how much tickets cost. Also, while the parties testified to enjoying wine during the marriage, there was no evidence of actual wine expenditures and, hence, no basis for a remarkably high monthly budget of $1,950 for wine.

¶ 222 We disagree with respondent, however, that "much, if not most," of the parties' entertainment and travel was business-related such that petitioner would have no entitlement to such expenses post-divorce because they would no longer have a business purpose. See *In re Marriage of Murphy*, 359 Ill. App. 3d 289, 304-05 (2005) (excluding, from assessment of the marital lifestyle, travel and entertainment that was in fulfillment of the husband's responsibility for "entertaining clients, maintaining and developing industry contacts, and checking on the progress of work at various sites"). Petitioner acknowledged that the parties sometimes traveled purely for business, but the travel she was asking to be considered for setting maintenance was purely recreational or at least had a recreational component. Respondent cited *Murphy* in closing

argument, yet the court did not suggest that it was excluding any expenses from the marital lifestyle on the ground that they were business-related. The court noted that the parties' "business associates were also social friends" and that the parties "combined business and pleasure whenever possible." As the court observed, the parties contradicted each other as to the purpose for the parties' travel and entertainment. The Stephenson employees who testified on the subject tended to agree with respondent that their travel with him always had a business purpose, even if there was another purpose as well. Considering the record in its totality, we cannot say that the parties' travel and entertainment should not have been considered part of the marital lifestyle for purposes of setting maintenance.

¶ 223   We proceed to the amounts that Belmonte Newman allowed for the support of petitioner's mother, Valentine, and for gifts to family, friends, and charity (total of $61,889 per month). Respondent cites *In re Marriage of Homann*, 276 Ill. App. 3d 236, 241 (1995), where the court held that gifts to church and family were not properly considered among the petitioner wife's current expenses for purposes of determining her need for maintenance. The court remarked that "[g]enerosity is laudable, but petitioner should not expect respondent to subsidize her gift-giving." *Id.* The issue in *Homann* was not whether gifts and charity can properly be considered part of the marital lifestyle for setting maintenance. Rather, the wife in *Homann* was asking that gifts and charity be considered part of her legitimate current expenses for purposes of calculating her post-divorce needs. Our view is that, for purposes of setting maintenance, gifts and charity are as legitimate a part of a marital lifestyle as entertainment and travel.

¶ 224   Here, however, the trial court could have properly discounted the amounts requested for charity and gifts. Petitioner testified that she was involved in charitable work during the marriage and that the parties enjoyed attending charity galas, but she presented no historical data to support

such a substantial request as $29,199 per month for charitable giving. Also, her request for $2,773 per month for gifts was supported by simply anecdotal evidence of occasional, albeit generous, gifts.

¶ 225 Moreover, we agree with respondent that maintenance to provide care for Valentine has no basis in law. Maintenance is designed for support of the individual recipient. The overall well-being of a spouse may include the continuation of charity that the couple practiced during the marriage. It is too much, however, to expect a spouse to continue support of an in-law once the marriage ends. Respondent's support of Valentine during the parties' separation was commendable, but he is no more obligated to fund petitioner's support of her mother post-divorce than he is to provide the support himself. Accordingly, the trial court would have been justified in excluding care for Valentine from Belmonte Newman's projections.

¶ 226 The last expense we consider is the allocation for "special events," at $8,333 per month. Petitioner presented evidence that the parties spent lavishly on their wedding, their anniversaries, and on birthday parties for each other and Shelby. Petitioner testified that she desired to continue treating her family to such "extravagant" affairs. The requested amount was not reasonable. First, the events described were milestones—occasional by their nature—and hardly warranted an allotment of $100,000 per year. Second, many of those events were celebrations of the parties' marriage, which has ended.

¶ 227 Petitioner also argues that the trial court erred by not specifying in the dissolution judgment that the maintenance award is nonmodifiable. Respondent contends that petitioner forfeited this issue by failing to raise it in a posttrial motion. To support his claim of forfeiture, respondent cites a criminal case, forgetting that "failure to raise an issue in a posttrial motion does not preclude a party from raising that issue on appeal in nonjury civil cases." *Kic v. Bianucci*,

2011 IL App (1st) 100622, ¶ 12 (citing Ill. S. Ct. R. 366(b)(3)(ii) (eff. Feb. 1, 1994) ("Neither the filing of nor the failure to file a post judgment motion limits the scope of review."). On the merits of the issue, respondent agrees with petitioner that maintenance awarded under the PNA is nonmodifiable (in fact, the PNA expressly says so), and respondent submits that the dissolution judgment "is sufficiently clear to indicate that[,] based on the [PNA][,] maintenance is nonmodifiable." We agree with respondent. The judgment states that respondent's "maintenance obligation shall be secured and continue until termination as stated in section 4.4(d) of the [PNA]." When the order is read in light of the PNA, to which the order refers, it is clear that the maintenance obligation shall continue, unmodified, until termination per the PNA. We see no need for the trial court to make its intent plainer.

¶ 228   Finally, petitioner asks us to compare the maintenance award with the statutory guidelines though this case is not controlled by them. She cites *In re Marriage of Johnson*, 2016 IL App (5th) 140479. In *Johnson*, the trial court's maintenance award predated the guidelines, but on appeal the Fifth District Appellate Court cited the guidelines as "support" for the award, noting that although the amended section 504 "is not applicable to this appeal, it does provide some guidance." *Id.* ¶ 108. We respectfully disagree with the Fifth District's approach. This is not a case that would have been governed by the guidelines but for the trial court's finding that the guidelines were inappropriate for the case. See 750 ILCS 5/504(b-1)(1) (West 2016) (the trial court can deem a case inappropriate for the guidelines even if it would otherwise qualify). Rather, this case is expressly excluded from the guidelines by the parties' income level (which exceeds $250,000). *Id.* The legislature had its reasons for placing an income cap on cases eligible for the guidelines. It would undermine that intent for us to compare with the guidelines a case that is expressly excluded from them.

¶ 229 For the foregoing reasons, we hold that the trial court did not abuse its discretion in awarding petitioner $55,000 in maintenance. We base our holding on the following considerations: (1) petitioner was awarded a total of $11.1 million in property; (2) respondent was required to pay for petitioner's purchase of a home (maximum price of $450,000 as of 2017); (3) respondent was required to pay for petitioner to obtain a four-year undergraduate degree at the institution of her choice; (4) though the PNA states that petitioner shall be primarily responsible for her own support, she did not, in the seven years that the parties were separated before trial, seek to become gainfully employed or to obtain the undergraduate education that respondent was obligated to fund; and (5) the lifestyle analysis provided by Belmonte Newman lacked sufficient historical data at many significant points.

¶ 230                    E. Contribution to Attorney Fees and Costs

¶ 231 Petitioner's final argument on appeal is that the trial court awarded her an inadequate amount of attorney fees and costs in deciding her contribution petition.

¶ 232 Section 508(a) of the Act (750 ILCS 5/508(a) (West 2016)) states that, in conjunction with its judgment of dissolution, the trial court may direct contribution from a party toward the opposing party's attorney fees and costs, in accordance with section 503(j) of the Act (750 ILCS 5/503(j) (West 2016)). Section 503(j)(2) provides that the trial court must decide a petition for contribution based on the factors that govern property division (750 ILCS 5/503 (West 2016)) and maintenance (750 ILCS 5/504 (West 2016)). 750 ILCS 5/503(j)(2) (West 2016). Above, we set forth the factors pertinent to maintenance. *Supra ¶* 180. The factors governing property division are as follows:

"(1) each party's contribution to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property ***;

(2) the dissipation by each party of the marital property ***;

(3) the value of the property assigned to each spouse;

(4) the duration of the marriage;

(5) the relevant economic circumstances of each spouse ***;

(6) any obligations and rights from a prior marriage of either party;

(7) any prenuptial or postnuptial agreement of the parties;

(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(9) the custodial provisions for any children;

(10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties."  750 ILCS 5/503(d) (West 2016).

¶ 233   Courts have summarized the inquiry as follows: "In determining an award of attorney fees, the trial court considers the relative financial circumstances of the parties, including the allocation of assets and liabilities, maintenance, and the parties' relative earning abilities. *In re Marriage of Tworek*, 2017 IL App (3d) 160188, ¶ 18. "[A] party seeking contribution must establish that he or she is unable to pay his or her attorney fees and that the other party is able to do so." *In re Marriage of Heroy*, 2017 IL 120205, ¶ 30.  "The statutory factors are the tools used by the court to decide whether a party is unable to pay and whether the other party is able to do so." *Id.*  "[A] party is unable to pay if, after consideration of all the relevant statutory factors, the

court finds that requiring the party to pay the entirety of the fees would undermine his or her financial stability." *Id.* ¶ 19.

¶ 234   Conduct that unnecessarily increases the cost of litigation is also a factor in allocating attorney fees. *In re Marriage of Kane*, 2016 IL App (2d) 150774, ¶ 38.   The trial court's ruling on a request for contribution is reviewed for abuse of discretion.   *Tworek*, 2017 IL App (3d) 160188, ¶ 18.

¶ 235   Here the trial court found that $3,350,921 of petitioner's requested fees were reasonable and necessary.   See *Kane*, 2016 IL App (2d) 150774, ¶ 22 (only reasonable fees are subject to contribution).   The court then directed respondent to contribute $2,000,000 toward those fees. The court reasoned:

> "[A]fter consideration of [the statutory factors], [respondent] shall contribute funds
> toward [petitioner's] fees and costs.   The court is cognizant of the value of [petitioner's]
> award for her interests in the entities, potential earned income from the $6.5 million dollars
> award, and her monthly maintenance.   However, taking into account the amount of fees
> and costs incurred the court finds that requiring [petitioner] to pay the entirety of her fees
> would undermine her financial security.   The court also is cognizant that financial stability
> is relative.   [Petitioner] has enjoyed a higher standard of living than most."

Petitioner was left responsible for the balance of $1,350,921.

¶ 236   Although there are numerous factors that bear upon a request for contribution, the parties' arguments on appeal concern primarily two factors:   the parties' conduct in litigation tactics and their respective financial circumstances.

¶ 237   First, petitioner complains at length that respondent's " 'scorched earth' litigation tactics" needlessly increased the cost of litigation.   Respondent reciprocates with a comparable litany of

complaints against petitioner's own conduct. Ultimately, the trial court placed essentially equal fault on both sides. In ruling on respondent's motion for sanctions (which is not at issue on appeal), the court made findings that are relevant to the issue of contribution as well:

> "Throughout this proceeding each side has complained about the other as relates to discovery and pleadings. The court has refereed discovery since day one. [Respondent] fought disclosure even using outside counsel in *** ancillary actions. [Petitioner] certainly could have more narrowly tailored her requests. Disputes certainly could have been resolved with more meaningful 201(k) conferences. Personalities prevented cooperation."

Based on our review of the proceedings, respondent's conduct is not a basis for upsetting the trial court's allocation of fees.

¶ 238 Petitioner also asserts that she cannot pay the $1.5 balance of fees without undermining her financial stability. Petitioner was awarded $11 million in property, including $6.5 in liquid assets from the buyout of her interests in the Stephenson entities. At the rate of return projected by Gonzalez, her financial adviser, petitioner will earn in excess of $400,000 per year on the $6.5 million. Petitioner was also awarded $55,000 per month in maintenance. The trial court found that petitioner could pay $1.3 million out of her considerable resources without undermining her financial security. We cannot say that no reasonable person could take the trial court's view. While respondent has vastly more resources than petitioner, that fact is not decisive. The default rule in American courts is that each party pays her own attorney fees, and the party who seeks contribution toward her attorney fees bears the burden of proving not only that the other party has the ability to pay but that she *lacks* the ability to pay. *Heroy*, 385 Ill. App. 3d at 667. The court

did not err in finding that petitioner failed to demonstrate that she lacks the ability to pay the $1.3 million in fees.

¶ 239                                    III. CONCLUSION

¶ 240   For the foregoing reasons, we affirm the judgment of the circuit court of McHenry County.

¶ 241   Affirmed.